IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

TIM BROWN, et al.,

     Plaintiffs,

v.                      CIVIL ACTION NO. 1:10-1245

TETHYS BIOSCIENCE, INC.,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

By Judgment Order entered on September 28, 2012, the court **GRANTED** in part and **DENIED** in part defendant's motion for summary judgment as to defendant Valerie Honaker. (Doc. # 96). Plaintiff filed a response in opposition to defendant's motion[1] and defendant filed a reply. The reasons for that decision follow.

## I. Background

This case arises out of the circumstances leading to and surrounding plaintiff Valerie Honaker's former employment with defendant Tethys Bioscience, Inc. ("Tethys"). Tethys is a start-up company supported by venture capital financing. Deposition of

_____

[1] Tethys filed four motions for summary judgment, one for each plaintiff, presumably because the claims for each plaintiff are governed by the laws of different states. According to plaintiffs, "[s]ince the factual and legal arguments overlap, one response to these four motions is appropriate." Plaintiffs' Memorandum in Opposition at 1. However, whether because they chose to file only one brief in response to four motions or for some other reason, plaintiffs' memorandum fails to address many of the issues advanced in defendant's motion in a meaningful way.

Brian Best, August 3, 2011, at 117-18 (attached as Exhibit A to Defendant's Motion for Summary Judgment).  In January 2009, Tethys launched its first product, the PreDx Diabetes Risk Score ("PreDx").  Best Depo. at 16.  The PreDx uses blood tests to determine a patient's risk of developing Type 2 diabetes within 5 years.  Complaint ¶ 9.

A.      *Hiring of Honaker*

        Following the successful launch of PreDx in January 2009, Tethys began to recruit additional salespersons.  Best Depo. at 16.  Honaker was contacted about a position with Tethys by a former colleague, Jamie Williams.  Deposition of Valerie Honaker, August 17, 2011, at 34-35 (Exhibit B to Defendant's Motion). Additionally, Honaker had responded to an online posting that she later discovered was made by Tethys.  See id. at 35.  After submitting her application for a position with Tethys, Honaker interviewed with Bonnie Zell, a consultant with Tethys who assisted with recruiting the sales team, and Tricia Perks, who was the National Sales Director at that time.  Deposition of Bonnie Zell, August 5, 2011, at 7-8 (Exhibit D to Defendant's Motion); Deposition of Trisha Perks, August 2, 2011, at 9, 57-58, 76-77 (Exhibit C to Defendant's Motion and Exhibit C to Plaintiff's Memorandum in Opposition).

According to Honaker, during her interview, she was informed by Perks and Zell that Tethys had already secured national contracts with LabCorp.  Honaker Depo. at 39-41, 49, 51.

A:   Do you have national contracts?  Because I live in North Carolina and the national headquarters for LabCorp Corporation is 45 minutes from my house.  And I can guarantee you that 9.9 out of 10 offices that you go, Trish, are LabCorp.  Do you have a national lab contract with them?

"We've got it under control.  We have a brilliant group of people.  They're brilliant.  They're all top-shelf.  Valerie, you are going to be so pleased.  You're going to make so much money."

And Bonnie Zell: "Outstanding.  This is outstanding.  You better not pass up on this opportunity."

"So you're telling me, you have contracts with LabCorp, Trish?"

"Yes. We've got it under control.  We've got it under control.  It's going to be a slam-dunk."

Q:   Did she say that it was a pilot program with LabCorp?

A:   No mention of a pilot program.

Q:   And I notice you haven't used the word national contract with respect to any response by Trish.  Did she ever use the term national contract?

A:   Elaborate on what you're trying to ask me.

Q:   Well, when you've been reciting the conversation, you've never said that Trish said "There was a national contract."

A:   Trish told me that they had a national contract with LabCorp.

* * *

3

Q:    Well, you're telling me that Trish Perks said there
      was a national contract.  What was the follow-up
      questions about that?

A:    Said, "Wow.  That's pretty outstanding."

                        *  *  *

Q:    And I asked them if they have [a] national contract.
      My genuine concern is LabCorp.  I have lived there
      for ten years.  They have wallpapered the state of
      North Carolina with their logo.  That was a genuine
      concern of mine because I would have, no way, gone to
      work for anybody when I'm doing exceedingly well with
      an existing company.

      With LabCorp being the critical component and
      Bonnie and Trish both sitting there and telling me
      that they had a national contract with LabCorp, I
      felt comfortable.

Id. at 39-42.

Perks denies telling Honaker that a national contract with

LabCorp was in place during her interview.  Perks Depo. at 76-77.

According to Perks, any conversation regarding a LabCorp contract

would have been limited to the existence of a pilot program.

Perks Depo. at 76-77.  Honaker contends that her conversation with

Perks was not about a pilot program and that the first time she

heard of a pilot program was in March 2010.  Honaker Depo. at 51-

53, 58-59.

Honaker next interviewed with Brian Best, the then-Vice-

President of Commercial Operations.  Honaker Depo. at 44-45.

Following this meeting, Tethys made Honaker an offer of

employment, which she accepted.  Honaker Depo. at 62-63.

Honaker also testified that Brian Best informed her a national contract with LabCorp was in place.

Q:  Okay.  Do you recall exactly what Mr. Best said about a national blood draw contract?

A:  It's under control.  We have everything.  It is not going to be a problem.  You just need to go out there and sell it, Valerie.  Because the more you can sell, the quicker we can go to IPO.  We have to do due diligence and we have a national contract in place. LabCorp is not a problem.

Q:  Did he tell you it was a national contract or did he say it was a pilot contract?

A:  I'd never heard pilot program, pilot contract program with LabCorp, until March.

Q:  And when - - what did you hear in March?

A:  That's when "Oh, we're not going to  - - this national contract is not going to go through because we're squabbling over $2, but they agreed to let us pilot a program."

     I said, "Well, hold up.  Pilot a program?  You told me in November, at my interview, that you had a national lab contract and now you're reneging on that?

Q:  Okay.  Who did you hear this from in March?

A:  Trisha Perks, Brian Best.

Id. at 51-52.

Best testified that he doesn't believe he discussed LabCorp contracts with Honaker during her interview and that he never informed her Tethys had national contracts with any laboratory.  Best Depo. at 37, 53.

5

B.      *Honaker's Performance*

On November 30, 2009, Honaker began her employment with
Tethys.  Honaker Depo. at Ex. 4.  Throughout her employment with
Tethys, Honaker never met her sales goals.  Honaker Depo. at 58-
59, 73-74.  On July 23, 2010, Honaker was placed on a Performance
Improvement Plan ("PIP") due to ongoing sales deficiencies.
Honaker Depo. at 88-89.  Under the terms of the PIP, Honaker had
to generate a specified number of sales by a certain date or her
employment with Tethys would be terminated.  Honaker Depo. at 88.
Honaker did not sign and return the PIP which Tethys deemed to be
a resignation of her position with the company.  Honaker Depo. at
89, 98-99.

C.      *Use of Gift Cards and Other Methods to Generate Sales*

Honaker claims that she was told to use "any means
necessary" to generate sales of PreDx.  In particular, she claims
that she was told on multiple occasions by Tethys management to
incentivize offices to obtain sales, including the use of gift
cards and other enticements.  Honaker Depo. at 80-83, 90-91.
Honaker states that she notified Tethys on multiple occasions of
her objection to using gift cards or other enticements to make
sales.  Honaker Depo. at 82, 91-92.

According to Best, the practice of using gift cards to
generate sales was not approved or encouraged by Tethys.  Best
Depo. at 70.  When Seneca Garrett, a Regional Account Manager with

Tethys, admitted to using gift cards to get business, Best
directed Garrett's supervisor to notify Garrett that it was not
appropriate to use gift cards to induce sales.  Best Depo. at 70.

D.      *Procedural History*

On or about September 23, 2010, Honaker, along with Tim
Brown, Michael Lillie, Richard Hidalgo, and Bonnie Weiss
(collectively "Plaintiffs"), filed the instant action against
Tethys in the Circuit Court of Mercer County.  On October 21,
2010, Tethys removed the case to this court on the basis of
diversity jurisdiction.  All of the remaining plaintiffs[2] except
for Weiss are residents of states other than West Virginia.
Honaker is a resident of Cary, North Carolina.  Second Amended
Complaint at ¶ 4.  On March 30, 2012, the court granted
plaintiffs' second motion to amend which sought to add Cynthia
Walker, a resident of Indiana, as a plaintiff and assert claims
for negligence and negligent misrepresentation.

Plaintiffs' Second Amended Complaint contains four claims
relevant to Honaker:  Actual and/or Constructive Fraud (Count I),
Negligent Misrepresentation (Count II), Negligent Supervision
and/or Training (Count III), and Retaliatory Discharege (Count
VII).  The instant motion seeks judgment in Tethys' favor on all
the claims asserted by Honaker.

---

[2] A Stipulation of Dismissal, pursuant to Fed. R. Civ. P.
41(a)(1)(A)(ii), as to plaintiff Tim Brown was filed on June 8,
2011.

## Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered
> forthwith if the pleadings, depositions,
> answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, show that there is
> no genuine issue as to any material fact
> and that the moving party is entitled to
> a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  <u>Id.</u> at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there
> must be evidence on which the jury could
> reasonably find for the plaintiff.  The
> judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could

> find, by a preponderance of the
> evidence, that the plaintiff is entitled
> to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 250-51.

## **Analysis**

A.   *Fraud*

According to Honaker, Tethys committed fraud when it
informed her during her interview that it had a national contract
with LabCorp.  Tethys denies ever making such a representation.

Under North Carolina law, the following essential
elements of actual fraud are well established: (1) false
representation or concealment of a past or existing material
fact, (2) reasonably calculated to deceive, (3) made with intent
to deceive, (4) which does in fact deceive, (5) resulting in
damage to the other party.  Silicon Knights, Inc. v. Epic Games,
Inc., No. 5:07-CV-275-D, 2011 WL 1134453, *6 (E.D.N.C. Jan. 25,
2011); Sutton v. Driver, 712 S.E.2d 318, 325 (N.C. 2011).  Only
if a misrepresentation is material will fraud be established.  A
misrepresentation is "`material' if, had it been known to the
party, it would have influenced the party's judgment or decision
to act." Latta v. Rainey, 689 S.E.2d 898, 909 (N.C. App. 2010)
(citing Godfrey v. Res-Care, Inc., 165 N.C. App. 68, 75-76 (N.C.
2004)); In re Ross, Bankruptcy No. 11-30812, 2012 WL 3987861, *9

(Bankr. W.D.N.C. Sept. 11, 2012)("The representation must also be material, in that it would have influenced the recipient's decision to act."). "Materiality is generally a question of fact for the jury." <u>Latta</u>, 689 S.E.2d at 909; <u>see also</u> <u>Colony Ins. Co. v. Peterson</u>, No. 1:10CV581, 2012 WL 1867047, *16 (M.D.N.C. May 22, 2012)(same).

During her deposition, Honaker stated that she told Perks that she knew having a contract with LabCorp was critical. Honaker Depo. at 42. She also testified that she would never have left her current employment to go to work for Tethys without a national contract in place.

> A: And I asked them if they have [a] national contract. My genuine concern is LabCorp. I have lived there for ten years. They have wallpapered the state of North Carolina with their logo. That was a genuine concern of mine because I would have, no way, gone to work for anybody when I'm doing exceedingly well with an existing company.

Honaker Depo. at 42. Tethys argues that the alleged misrepresentations were not material because a national contract with LabCorp was not mentioned in Honaker's offer letter. While this fact might be some evidence of the materiality - or lack thereof- of the representations, it does not show the statements made to Honaker were immaterial. Given the foregoing, there is

10

sufficient evidence for the materiality of the alleged
misrepresentations to go to the jury.

B.     *Negligent Misrepresentation*

        Under North Carolina law, the tort of negligent
misrepresentation occurs when (1) a party justifiably relies (2)
to his detriment (3) on information prepared without reasonable
care (4) by one who owed the relying party a duty of care.
<u>Raritan River Steel Co. v. Cherry, Bekaert & Holland</u>, 367 S.E.2d
609, 612 (1988), <u>reversed on other grounds</u>, 407 S.E.2d 178
(1991); <u>Simms v. Prudential Life Ins. Co. of America</u>, 537 S.E.2d
237, 240 (N.C. App. 2000).  Justifiable reliance is an essential
part of any claim for negligent misrepresentation.  <u>See</u> <u>Simms</u>,
407 S.E.2d at 240 ("[P]laintiffs at bar must be able to show that
they justifiably relied – to their detriment – on the information
provided them by defendants. . . .").

        The same disputed issues of material fact that foreclose
judgment in Tethys' favor on the fraud claim exist here as well.
Accordingly, the motion for summary judgment as to Count II is
DENIED.

C.     *Negligent Training/Negligent Supervision*

        In support of her negligence claim, Honaker contends that
Tethys breached a duty of care owed to her by "(a) fail[ing] to
adequately train its interviewers, and/or (b) fail[ing] to
adequately inform its interviewers regarding the existence of

11

contracts with medical laboratories and agreements with HMO's, and/or (c) fail[ing] to use reasonable care and to exercise due diligence in determining the existence of contracts with medical laboratories and agreements with HMO's prior to making affirmative statements on the subject." Second Amended Complaint ¶ 42. Stated another way, Honaker contends that Tethys was negligent in its training and/or supervision of its interviewers.[3]

North Carolina courts recognize claims for negligent supervision and training. See Gamble v. Barnette, Civil Docket No. 5:06-CV104, 2007 WL 2003418, *5 (W.D.N.C. Jul. 5, 2007).

> To state a claim for negligence in North Carolina, "a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Fussell v. N.C. Farm Bureau Mut. Ins. Co., 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010) (citation omitted).  To succeed on a specific claim of negligent hiring, retention, or supervision, the plaintiff must prove: (1) the specific negligent act on which the action is founded; (2) "incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred"; (3) the employer's actual or constructive notice of the employee's incompetence; and (4) "that the injury complained of resulted from the incompetency proved." Medlin v. Bass, 327 N.C. 587, 590-91, 398 S.E.2d 460, 462 (1990) (citation omitted); see also

---

[3] Honaker's contention that Tethys failed to use reasonable care and due diligence in determining the existence of contracts with medical laboratories prior to making affirmative statements on the subject is actually just a restatement of her negligent misrepresentation claim and does not support a separate claim for negligence.

Foster v. Nash-Rocky Mount Cnty. Bd. of Educ.,
191 N.C.App. 323, 330, 665 S.E.2d 745, 750
(2008).  North Carolina's courts also recognize
claims of negligent training based on the general
elements of negligence. See Floyd v. McGill, 156
N.C. App. 29, 35-36, 575 S.E.2d 789, 793-94
(2003).

Swick v. Wilde, No. 1:10-cv-303, 2012 WL 3780350, *30 (M.D.N.C.

Aug. 31, 2012) (quoting Medlin v. Bass, 398 S.E.2d 460, 462 (N.C.

1991)); see also McFadyen v. Duke University, 786 F. Supp.2d 887,

1002 (M.D.N.C. 2011) (noting that a "negligent supervision claim

may be asserted as an alternative to `respondeat superior'

liability under state law).[4]

Tethys contends that it is entitled to judgment in its

favor on this claim because Honaker cannot prove the elements of

either a negligent supervision or negligent training claim.

Rather than address the deficiencies noted by Tethys in any

meaningful way, plaintiff merely states that this claim is not

ripe for decision because she has not engaged in discovery on the

issue.  According to her, plaintiffs' motion to amend seeking to

add this claim was awaiting disposition when discovery in this

case closed and, therefore, the motion for summary judgment is

premature.  Plaintiff did not file an affidavit or declaration

---

[4] Both McFadyen and Whitlock v. Chaffin, No. 3:11cv352, 2012
WL 2681945, 8 (W.D.N.C. Jul. 6, 2012), seem to suggest that a
negligent supervision claim arises when an employee is acting
outside the scope of employment and may only be asserted as an
alternative to respondeat superior liability.

pursuant to Fed. R. Civ. P. 56(d).  Nor did she seek to reopen discovery once the court granted the motion to amend.

The court agrees with Tethys that is somewhat disingenuous for plaintiff to complain, at this juncture, that she did not have the opportunity to conduct discovery on the negligent training/supervision claim.  The depositions in this matter confirm that Tethys engaged in discovery regarding these claims even though the motions to amend remained pending.  Furthermore, plaintiff has not suggested that she was somehow thwarted in her effort to conduct discovery on this claim by Tethys.

The court will, however, reopen discovery in this matter for a period of 45 days to allow additional discovery regarding Count III.  At the conclusion of this 45 days, Tethys will be permitted to file another summary judgment motion as to this claim.  This limited reopening of discovery should not affect the proposed late January/early February trial of this matter.

D.    *Retaliatory Discharge*

Honaker contends that Tethys encouraged her to use gift cards and other "unethical and illegal means" to promote sales of the PreDx test.  According to her, she was discharged because of her refusal to use these "unethical and illegal means."  Second Amended Complaint ¶¶ 66-68.

14

"North Carolina strictly adheres to the employment-at-will doctrine pursuant to which an employee may be dischareged for no reason, or for an arbitrary or irrational reason." Mitchell v. Bandag, Inc., 147 F. Supp.2d 395, 399 (E.D.N.C. 1998) (internal citations and quotations omitted); Garner v. Rentenbach Constructors, Inc., 515 S.E.2d 438, 439-40 (N.C. 1999) ("[I]n the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party."). North Carolina has, however, recognized a cause of action for wrongful discharge in violation of the public policy of North Carolina. See Coman v. Thomas Manufacturing Co., 381 S.E.2d 445, 447 (N.C. 1989).

> There is no specific list of what actions constitute a violation of public policy. . . . However, wrongful discharge claims have been recognized in North Carolina where the employee was discharged (1) for refusing to violate the law at the employer's request, . . . (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy[.]

Kranz v. Hendrick Automotive Group, Inc., 674 S.E.2d 771, 773 (N.C. App. 2009) (quoting Whitings v. Wolfson Casing Corp., 618 S.E.2d 750, 752-53 (2005)). Furthermore, "the public policy exception to the at-will employment doctrine is confined to the

15

express statements contained within our General Statutes or our
Constitution." Id.

"Under [the] public policy exception, the employee has
the burden of pleading and proving that the employee's dismissal
occurred for a reason that violates public policy." Id.
(quoting Salter v. E & J Healthcare, Inc., 575 S.E.2d 46, 51
(N.C. App. 2003)).  Honaker contends that Tethys' direction
regarding the use of gift cards violated two federal statutes
and, as such, contravened the public policy of North Carolina.
Tethys disagrees that its actions violated any statute - -
federal or otherwise - - but argues that, in any event, federal
public policy cannot be used to support a claim for retaliatory
discharge under North Carolina law.

In Coman v. Thomas Mfg. Co., 381 S.E.2d 445, 449 (N.C.
1989), the North Carolina Supreme Court found that an employee
stated a cause of action for wrongful discharge when he was
terminated based upon his refusal to violate federal Department
of Transportation regulations.  The Coman court specifically
noted, however, that plaintiff's refusal to violate federal
regulations also violated the public policy of North Carolina.

> Although plaintiff specifically alleges that
> defendant's acts violated the regulations of the
> federal Department of Transportation, this
> conduct also violated the public policy of North
> Carolina.  N.C.G.S. § 20-384 provides that the
> Division of Motor Vehicles may promulgate highway
> safety rules and regulations for interstate and
> intrastate motor carriers in North Carolina.

16

This has been done in the North Carolina
Administrative Code, which provides that the
rules and regulations adopted by the federal
Department of Transportation in 49 C.F.R. §§
390-398 shall apply on the highways of North
Carolina. 19A NCAC 3D.0801 (1988).  Thus,
according to plaintiff's allegations when
defendant discharged plaintiff, it violated the
federal regulations and the public policy of
North Carolina as established in the
Administrative Code.  Further evidence of the
public policy of our state regarding the safety
of the highways is found in N.C.G.S. § 20-397,
which provides criminal penalties for seeking to
evade or defeat such regulations.

Id. at 447.

In this case, Honaker has not even attempted to tie
Tethys' alleged violation of federal law to the public policy of
North Carolina.  Accordingly, the alleged violation of federal
law, standing alone, would appear to be insufficient to fall
within North Carolina's public policy exception to the employment
at will doctrine.[5]  See Sabrowski v. Albani-Bayeux, Inc., No. 04-
1114, 2005 WL 435416, *2 (4th Cir. Feb. 25, 2005) ("Sabrowski has
not identified, and we have not found, any North Carolina
authority establishing a public policy that shields one's medical
records from her employer.") (emphasis added); see also Smith v.
SmithKline Beecham Corp., No. 1:08CV511, 2009 WL 1851180, *2

---

[5] For example, Pennsylvania law is very clear on this point.
"[I]n order for the public policy exception to apply, the alleged
violation must be of Pennsylvania public policy, not solely an
alleged violation of federal law."  Quint v. Thar Process, Inc.,
Civil Action No. 11-116, 2011 WL 4345925, *11 (W.D. Pa. Sept. 15,
2011).

(M.D.N.C. Jun. 26, 2009) (discussing <u>Coman</u> and noting that "requiring an employee to commit an unlawful act under North Carolina law, or terminating his employment for refusing instructions to violate North Carolina law, offends the public policy of North Carolina and therefore creates an impermissible basis for termination.").

However, this court need not decide whether the alleged violation of federal law, without more, violates the public policy of North Carolina because there is insufficient evidence to show that Tethys required Honaker to violate the law or be terminated for a failure to do so. Honaker contends that Tethys' direction regarding the use of gift cards violated two federal statutes.

First, she argues that Tethys' practices in this regard violated 42 U.S.C. § 1395nn(a)(1), the Stark Act. "The Stark Act, also referred to as the Physician Self-Referral Law, prohibits two things if a physician or member of his or her immediate family has a direct or indirect `financial arrangement with an entity:' (1) the physician `may not make a referral to the entity of certain designated health services' covered by the Medicare program; and (2) the entity `may not present or cause to be presented' a claim to Medicare for any such services following any such referral. <u>U.S. v. Center for Diagnostic Imaging, Inc.</u>, 787 F. Supp.2d 1213, 1224 (W.D. Wash. 2011) (quoting 42 U.S.C. §

1395nn(a)(1)(A) and (B)); <u>see also</u> <u>Braun v. Promise Regional</u>
<u>Medical Center-Hutchinson, Inc.</u>, No. 11-2180-RDR, 2011 WL
6304119, *3 (D. Kan. Dec. 16, 2011) (same).

By its plain terms, the Stark Act applies to physician
referrals. <u>Feldstein v. Nash Community Health Services, Inc.</u>, 51
F. Supp.2d 673, 686 (E.D.N.C. 1999) ("The Stark Act, a civil
statute enacted at 42 U.S.C. § 1395nn, prohibits certain
<u>physician referrals</u> where the physician has a financial
relationship with the entity to which he is referring patients.")
(emphasis added). Honaker does not even attempt to provide a
rationale as to how the section of the Stark Act cited by her, 42
U.S.C. § 1395nn(a)(1), should apply in this case given that
neither she nor Tethys is a physician.[6]

Furthermore, the Stark Act does not regulate all
physician referrals but only those in which payment will be
sought from Medicare or other federal health care programs. <u>See</u>
<u>See</u> <u>U.S. ex rel. Kosenske v. Carlisle HMA, Inc.</u>, No. 1:05-CV-
2184, 2007 WL 3490537, *6 (M.D. Penn. Nov. 14, 2007), <u>rev'd and</u>

_____

[6] Perhaps plaintiff is relying on 42 U.S.C. §
1395nn(a)(1)(B), which she neither cites nor quotes, as the
source of her public policy. That section, assuming an improper
physician referral has been made, prohibits an entity from making
a claim to Medicare for any such services following any such
referral. <u>See</u> 42 U.S.C. § 1395nn(a)(1)(B). However, as will be
discussed <u>infra</u>, there is no evidence that Tethys encouraged
Honaker to violate the Stark Act because Tethys discouraged
Honaker from trying to obtain Medicare and/or Medicaid referrals.

19

remanded on other grounds, 554 F.3d 88 (2009)("[T]he Stark Act prohibits a physician from referring patients to a health care entity with which the physician has a "financial relationship" for services covered by Medicare or other federal health care programs.") (emphasis added); McDonnell v. Cardiothoracic & Vascular Surgical Assocs., No C2-03-0079, 2004 WL 3733404, *9 (S.D. Ohio Aug. 3, 2004) ("Congress enacted Stark to address the strain placed on the Medicare Trust fund by overutilization of certain medical services by physicians who, for their own financial gain rather than their patients' medical needs, referred patients to entities in which the physicians held a financial interest.").  There is no evidence in this case that Tethys encouraged Honaker to violate the Stark Act because, by her own admission, Tethys discouraged her from pursuing Medicare and Medicaid sales.

> Q: Tell me what the policy was with respect to sales on Medicare and Medicaid patients, as you know it.
>
> A: Well, they weren't set up to bill for Medicaid or Medic[are].  So they told us that, under no circumstances, did they want us to have any tests coming in for Medicaid or Medicare.  No. 1, we were not going to get any type of compensation through, you know, a sales incentive.  It would not count towards our sales goals.  And since Tethys was not making any money off it, we were to have a conversation with our doctors and tell them that this test is not for Medicaid/Medicare patients.
>
> Q: And you were told that for both programs, both Medicare and Medicaid?
>
> A: Yes.

20

Honaker Depo. at 92-93.  If there has been no violation of the
Stark Act, "it is manifest that there can be no violation of any
public policy expressed by this statute."  Johnson v. Pepperidge
Farm, Inc., No. 93-1386, 1994 WL 118100, *4 (4th Cir. Apr. 4,
1994).

    Based on the foregoing, the Stark Act cannot provide a
basis for Honaker's retaliatory discharge claim in violation of
North Carolina's public policy.

    Honaker also alleges that she was terminated for her
refusal to violate the Medicare Anti-Kickback Act.  Like the
Stark Act, the Anti-Kickback Act was enacted to "deter abuse of
federal health care programs . . . ."  See See U.S. ex rel.
Kosenske v. Carlisle HMA, Inc., No. 1:05-CV-2184, 2007 WL
3490537, *5 (M.D. Penn. Nov. 14, 2007), rev'd and remanded on
other grounds, 554 F.3d 88 (2009).  A defendant violates the
Anti-Kickback Act when he "knowingly and willfully offers or pays
any remuneration . . . to any person to induce such person . . .
to refer an individual to a person for the furnishing or
arranging for the furnishing of any item or service for which
payment may be made in whole or in part under a Federal health
care program. . . ."  42 U.S.C. § 1320a-7b.  "The Anti-Kickback
Act reinforces the policies underlying the Stark Act through
criminal sanctions."  U.S. ex rel. Kosenske, 2007 WL 3490537 at
*6.

21

Again, the evidence before the court is that Tethys did not encourage Honaker to violate the Medicare Anti-Kickback Act because it specifically deterred her from trying to obtain Medicare and Medicaid business.  Therefore, she cannot argue that she was discharged for her refusal to do so.  For this and other reasons,[7] defendant's motion for summary judgment as to Count VII is GRANTED.

## Conclusion

Based on the foregoing, defendant's motion for summary judgment as to Valerie Honaker was GRANTED as to Count VII.  It was DENIED in all other respects.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

It is SO ORDERED this 1st day of October, 2012.

ENTER:

David A. Faber
Senior United States District Judge

---

[7] For example, even if Tethys did in fact encourage the use of gift cards when it was illegal to do so, Honaker's retaliatory discharge claim would still fail because she cannot show a causal connection between her refusal to do so and her termination. Honaker offers no evidence, other than her own self-serving explanation, to show that her discharge was in retaliation for her refusal to solicit business by using gift cards.  All of the evidence in the record supports Tethys' position that Honaker was discharged for her job performance, i.e., failure to meet sales goals.  See Livingston v. Wyeth, Inc., No. 1:03CV00919, 2006 WL 2129794, *14 (M.D.N.C. Jul. 28, 2006) (granting summary judgment in employer's favor in retaliatory discharge claim where "there is insufficient evidence to support a finding that Defendants required Livingston to violate the law or risk losing his job").

22