IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

TIM BROWN, et al.,

        Plaintiffs,

v.                                    CIVIL ACTION NO. 1:10-1245

TETHYS BIOSCIENCE, INC.,

        Defendant.

### MEMORANDUM OPINION AND ORDER

        By Judgment Order entered on September 28, 2012, the court **GRANTED** in part and **DENIED** in part defendant's motion for summary judgment as to defendant Richard Hidalgo.  (Doc. # 94). Plaintiff filed a response in opposition to defendant's motion[1] and defendant filed a reply.  The reasons for that decision follow.

### I.  Background

        This case arises out of the circumstances leading to and surrounding plaintiff Richard Hidalgo's former employment with defendant Tethys Bioscience, Inc. ("Tethys").  Tethys is a start-up company supported by venture capital financing.  Deposition of

---

        [1] Tethys filed four motions for summary judgment, one for each plaintiff, presumably because the claims for each plaintiff are governed by the laws of different states.  According to plaintiffs, "[s]ince the factual and legal arguments overlap, one response to these four motions is appropriate."  Plaintiffs' Memorandum in Opposition at 1.  However, whether because they chose to file only one brief in response to four motions or for some other reason, plaintiffs' memorandum fails to address many of the issues advanced in defendant's motion in a meaningful way.

Brian Best, August 3, 2011, at 117-18 (attached as Exhibit D to Defendant's Motion for Summary Judgment).  In January 2009, Tethys launched its first product, the PreDx Diabetes Risk Score ("PreDx").  Best Depo. at 16.[2]  The PreDx uses blood tests to determine a patient's risk of developing Type 2 diabetes within 5 years.  Deposition of Tricia Perks, August 2, 2011, at 30 (attached as Exhibit B to Defendant's Motion for Summary Judgment and Exhibit C to Plaintiff's Memorandum in Opposition); Complaint ¶ 9.

A.      *Hiring of Hidalgo*

        Following the successful launch of PreDx in January 2009, Tethys began to recruit additional salespersons.  Best Depo. at 16.  In late 2009, Hidalgo was contacted about a position with Tethys by a human resources specialist, Natalie Fong.  Deposition of Rich Hidalgo, August 18, 2011, at 40 (Exhibit A to Defendant's Motion and Exhibit D to Plaintiff's Response).  After separate telephone interviews with Bonnie Zell, a consultant with Tethys who assisted with recruiting the sales team, and Tricia Perks, who was the National Sales Director at that time, Hidalgo flew to Chicago, on December 21, 2009, for an in-person interview with both Perks and Zell.  Deposition of Bonnie Zell, August 5, 2011,

---

[2] Portions of Mr. Best's deposition, not attached to the instant motion, were submitted with the motions filed seeking judgment against the other plaintiffs.

at 7-8 (Exhibit C to Defendant's Motion); Perks Depo. at 9, 75, 96; Hidalgo Depo. at 43-44, 47.

According to Hidalgo, during his interview, he was informed by Perks and Zell that Tethys had already secured national contracts with LabCorp.  Hidalgo Depo. at 51-52.

A:    In talking to my friend, I said, "What do you think of this test?"

She said "Well, it's great, but you better make sure you have LabCorp or Quest on board with it because it's going to be tough to get it done."

I didn't really understand, but she started explaining to me that so many of the offices in the area have a national contract because the majority of physicians at this time don't have their own lab because most of them lose money on the lab in their office.

So I put that in my hat so I was sure to ask that question during the interview and was told that, "Yes," they do have a national contract with LabCorp, not with Quest.

Q:    Did you have an understanding of what that contract was going to facilitate, in other words, whether speaking to Ms. Huff, or otherwise, before you went into this - -

A:    No.

Q:    Let me just put this out there: Prior to December 21, when you went into that meeting, did you have an understanding of why it would be helpful to have a contract, for a company like Tethys to have a contract, of some kind, with a Quest or a LabCorp?

A:    No, I did not.

Q:    You had spoken with Tim Brown and with physicians enough, I take it, to know that the test required a blood draw - -

3

A:    Yes.  That's correct.

                        *  *  *

Q:    So as you walked into this meeting on December 21,
      you have this question you had been told to ask.  But
      as I understand it, you did not really understand how
      that was going to affect your role, as a sales
      person?

A:    Right, just that - - she advised me just, "Make sure
      you guys are covered with us [LabCorp] and you're on
      the menu, or it was going to be tougher."  I didn't
      understand logistically how much tougher it was going
      to be.

Q:    So that was a question that came up.  I think you
      testified that that came up during your meeting with
      Ms. Zell and Ms. Perks?

A:    Yes.

Q:    Again, I realize this is December '09 we're talking
      about. But, to the best of your ability, can you
      recall how you asked that and what they said, who
      said what in response?

A:    Sure.  I even talked about some of the work I had
      been doing prior to this as far as preparing for the
      interview.  One question that came up, that I spoke
      to a friend [at] LabCorp, "Are we going to be on
      their menu or are we working with them?"

      That's when Trish went "We've got LabCorp covered.
      Not a worry.  We'll be able to do that everywhere.
      It's not a problem."

Q:    She said "We've got LabCorp covered?"

A:    Yes, "LabCorp is covered.  We've got it everywhere.
      There will be no problem."

Q:    Now, did she make any mention of negotiations with
      LabCorp or a pilot program with LabCorp?

A:    Nothing.

Id. at 51-54.

                        4

Perks denies telling Hidalgo that a national contract with LabCorp was in place during his interview.  Perks Depo. at 75-76.  According to Perks, any conversation regarding a LabCorp contract would have been limited to the existence of a pilot program.  Perks Depo. at 75-76.  Hidalgo contends that his conversation with Perks was not about a pilot program.  Hidalgo Depo. at 54.

Hidalgo also interviewed with Brian Best, the then-Vice-President of Commercial Operations.  Hidalgo Depo. at 57.  Following this meeting, Tethys made Hidalgo an offer of employment, which he declined.  Hidalgo Depo. at 59.

Approximately six weeks after Hidalgo turned down Tethys' original offer of employment, he began to reconsider his decision.  Hidalgo Depo. at 60.  On February 11, 2010, he once again interviewed with Perks and Zell in Atlanta, Georgia.  Hidalgo Depo. at 61.  The subject of LabCorp and/or laboratory contracts was not discussed on February 11, 2010.  Hidalgo Depo. at 62.  While in Atlanta, Hidalgo was extended another offer of employment with Tethys which he accepted on the spot.  Hidalgo Depo. at 62.

B.    *Hidalgo's Performance*

On March 1, 2010, Hidalgo began his employment with Tethys.  Hidalgo Depo. at 65.  Throughout his employment with Tethys, Hidalgo never met his sales goals.  Hidalgo Depo. at 117.  On July 23, 2010, Hidalgo was placed on a Performance Improvement Plan ("PIP") due to ongoing sales deficiencies.  Hidalgo Depo. at

112.  Under the terms of the PIP, Hidalgo had to generate 30 sales by August 6, 2011, or his employment with Tethys would be terminated.  Hidalgo Depo. at 112 and Exhibit 5 to Hidalgo's Deposition.  Hidalgo signed the PIP and, when he failed to make the required number of sales, his employment with Tethys was terminated.  Hidalgo Depo. at 114-15, 121 and Exhibit 6 to Hidalgo's Deposition.

C.     *Use of Gift Cards and Other Methods to Generate Sales*

       Hidalgo claims that he was told to use "any means necessary" to generate sales of PreDx.  Hidalgo Depo. at 139-40. In particular, he claims that he was told by Tethys management to incentivize offices to obtain sales, including the use of gift cards and other enticements.  Hidalgo Depo. at 97-98 ("Mr. Best said `Look, gift cards are working for Seneca.  We're small enough.  We can fly under the radar.  You guys can do this.'").  Hidalgo states that he notified Tethys of his objection to using gift cards or other enticements to make sales.  Hidalgo Depo. at 94-95, 97, 100-01.

       According to Best, the practice of using gift cards to generate sales was not approved or encouraged by Tethys.  Best Depo. at 70.  When Seneca Garrett, a Regional Account Manager with Tethys, admitted to using gift cards to get business, Best directed Garrett's supervisor to notify Garrett that it was not appropriate to use gift cards to induce sales.  Best Depo. at 70.

6

D.      *Procedural History*

On or about September 23, 2010, Hidalgo, along with Tim Brown, Michael Lillie, Valerie Honaker, and Bonnie Weiss (collectively "Plaintiffs"), filed the instant action against Tethys in the Circuit Court of Mercer County.  On October 21, 2010, Tethys removed the case to this court on the basis of diversity jurisdiction.  All of the remaining plaintiffs[3] except for Weiss are residents of states other than West Virginia. Hidalgo is a resident of Tennessee.  Second Amended Complaint at ¶ 3.  On March 30, 2012, the court granted plaintiffs' second motion to amend which sought to add Cynthia Walker, a resident of Indiana, as a plaintiff and assert claims for negligence and negligent misrepresentation.

Plaintiffs' Second Amended Complaint contains four claims relevant to Hidalgo:  Actual and/or Constructive Fraud (Count I), Negligent Misrepresentation (Count II), Negligent Supervision and/or Training (Count III), and Retaliatory Discharge (Count VI). The instant motion seeks judgment in Tethys' favor on all the claims asserted by Hidalgo.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

---

[3] A Stipulation of Dismissal, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), as to plaintiff Tim Brown was filed on June 8, 2011.

> The judgment sought shall be rendered
> forthwith if the pleadings, depositions,
> answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, show that there is
> no genuine issue as to any material fact
> and that the moving party is entitled to
> a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial. Id. at 322. If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there
> must be evidence on which the jury could
> reasonably find for the plaintiff.  The
> judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could
> find, by a preponderance of the
> evidence, that the plaintiff is entitled
> to a verdict . . . .

8

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 250-51.

### Analysis

A.      *Fraud*

According to Hidalgo, Tethys committed fraud[4] when it informed him during his interview that it had a national contract with LabCorp.  Tethys denies ever making such a representation.

Under Tennessee law, the following six elements must be proven to establish a claim of intentional misrepresentation: (1) that the defendant made a representation of an existing or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant made the representation recklessly, with knowledge that it was false, or without belief that the representation was true; (5) that the plaintiff reasonably relied on the representation; and (6) that the plaintiff was damaged by relying on the representation.  Davis v. McGuigan, 325 S.W. 3d 149, 154 (Tenn. 2010); Naylor Medical Sales & Rentals, Inc. v. Invacare Continuing Care, Inc., No. 09-2344-STA-cgc, 2011 WL 2175206, *11 (W.D. Tenn. Jun. 3, 2011).  "The party alleging fraud bears the

---

[4] In Tennessee, the terms "intentional misrepresentation," "fraudulent misrepresentation," and "fraud are synonymous.  Cato v. Batts, No. M2009-02204-COA-R3-CV, 2011 WL 579153, *6 n.6 (Tenn. Ct. App. Feb. 17, 2011).

burden of proving each element." <u>Hiller v. Hailey</u>, 915 S.W.2d 800, 803 (Tenn. Ct. App. 1995).

Tethys argues that Hidalgo has shown no evidence from which a jury could find that he reasonably relied on the alleged misrepresentation regarding a national contract with LabCorp. According to Tethys, given that Hidalgo rejected the initial offer of employment and that he made no efforts to follow up on the LabCorp national contract issue before accepting the second offer of employment, it was unreasonable as a matter of law for him to rely on a statement made approximately 10 weeks earlier. Tethys also contends that, because Hidalgo did not fully appreciate the importance of a national LabCorp contract, he could not justifiably rely on a statement that one existed.

"Whether a person's reliance on a representation is reasonable generally is a question of fact inappropriate even for summary judgment. . . ." <u>N5ZX Avaiation, Inc. v. Bell</u>, No. 3-11-0674, 2011 WL 5520973, *4 (M.D. Tenn. Nov. 14, 2011).

> Whether a person's reliance on a representation is reasonable is generally a question of fact requiring the consideration of a number of factors, including the party's sophistication and expertise in the subject matter of the representation, the type of relationship— fiduciary or otherwise— between the parties, the availability of relevant information about the representation, any concealment of the misrepresentation, any opportunity to discover the misrepresentation, which party initiated the transaction, and the specificity of the misrepresentation. <u>Davis v. McGuigan</u>, 325 S.W.3d 149, 158 (Tenn. 2010) (citing <u>City State Bank v.</u>

> _Dean Witter Reynolds, Inc._, 948 S.W.2d 729, 737
> (Tenn.Ct.App.1996)).

_Laundries, Inc. v. Coinmach Corp._, No. M2011-01336-COA-R3-CV,
2012 WL 982968, *5 (Tenn. Ct. App. Mar. 20, 2012).  Certainly,
the issues identified by Tethys in arguing that Hidalgo could not
reasonably rely on any alleged misrepresentations are evidence
that the jury should consider in resolving this question of fact.
But it does not end the inquiry.

Given the foregoing, there is sufficient evidence for the
issue of Hidalgo's reliance on the alleged misrepresentations to
go to the jury and the motion for summary judgment as to Count I
is DENIED.

B.      _Negligent Misrepresentation_

Under Tennessee law, in order to prevail in a suit for
negligent misrepresentation, a plaintiff

> must establish by a preponderance of the evidence
> that the defendant supplied information to the
> plaintiff; the information was false; the
> defendant did not exercise reasonable care in
> obtaining or communicating the information; and
> the plaintiffs justifiably relied on the
> information.

_Strange v. Peterson_, No W1999-00489-COA-R3-CV, 2001 WL 29461, *2
(citing _Merriman v. Smith_, 599 S.W.2d 548, 556-57 (Tenn. Ct.
App. 1979)).  "Under Tennessee law, for both fraudulent and
negligent misrepresentation claims, [a] Plaintiff must show that
[he] reasonably relied upon the allegedly false information."

N5ZX Avaiation, Inc. v. Bell, No. 3-11-0674, 2011 WL 5520973, *4 (M.D. Tenn. Nov. 14, 2011).

The same disputed issues of material fact that foreclose judgment in Tethys' favor on the fraud claim exist here as well. Accordingly, the motion for summary judgment as to Count II is DENIED.

C.      *Negligent Training/Negligent Supervision*

In support of his negligence claim, Hidalgo contends that Tethys breached a duty of care owed to him by "(a) fail[ing] to adequately train its interviewers, and/or (b) fail[ing] to adequately inform its interviewers regarding the existence of contracts with medical laboratories and agreements with HMO's, and/or (c) fail[ing] to use reasonable care and to exercise due diligence in determining the existence of contracts with medical laboratories and agreements with HMO's prior to making affirmative statements on the subject." Second Amended Complaint ¶ 42. Stated another way, Hidalgo contends that Tethys was negligent in its training and/or supervision of its interviewers.[5]

_____

[5] Hidalgo's contention that Tethys failed to use reasonable care and due diligence in determining the existence of contracts with medical laboratories prior to making affirmative statements on the subject is actually just a restatement of his negligent misrepresentation claim and does not support a separate claim for negligence.

12

Under Tennessee law, in order to prove claims of negligent supervision and negligent training, a plaintiff must demonstrate: (1) a legally recognized duty owed by the defendant to the plaintiff, (2) the defendant's breach of that duty, (3) an injury or loss, (4) causation in fact, and (5) legal cause. Holt v. Macy's Retail Holdings, Inc., 719 F. Supp.2d 903, 917 (W.D. Tenn. 2010) (quoting Timmons v. Metro. Gov't of Nashville and Davidson County, 307 S.W.3d 735, 741 (Tenn. Ct. App. 2009) (internal quotations omitted)).  In addition to proving the elements of a negligence claim, in order to succeed on a claim of negligent supervision, a plaintiff must show "that the employer had knowledge of the employee's unfitness for the job." Shuler v. McGrew, No. 12-2003-STA-dkv, 2012 WL 3260685, *8 (W.D. Tenn. Aug. 8, 2012).

Tethys contends that it is entitled to judgment in its favor on this claim because Hidalgo cannot prove the elements of either a negligent supervision or negligent training claim. Rather than address the deficiencies noted by Tethys in any meaningful way, plaintiff merely states that this claim is not ripe for decision because he has not engaged in discovery on the issue.  According to him, plaintiffs' motion to amend seeking to add this claim was awaiting disposition when discovery in this case closed and, therefore, the motion for summary judgment is premature.  Plaintiff did not file an affidavit or declaration

13

pursuant to Fed. R. Civ. P. 56(d).  Nor did he seek to reopen discovery once the court granted the motion to amend.

The court agrees with Tethys that is somewhat disingenuous for plaintiff to complain, at this juncture, that he did not have the opportunity to conduct discovery on the negligent training/supervision claim.  The depositions in this matter confirm that Tethys engaged in discovery regarding these claims even though the motions to amend remained pending.  Furthermore, plaintiff has not suggested that he was somehow thwarted in his effort to conduct discovery on this claim by Tethys.

The court will, however, reopen discovery in this matter for a period of 45 days to allow additional discovery regarding Count III.  At the conclusion of this 45 days, Tethys will be permitted to file another summary judgment motion as to this claim.  This limited reopening of discovery should not affect the proposed late January/early February trial of this matter.

D.    *Retaliatory Discharge*

Hidalgo contends that Tethys encouraged him to use gift cards and other "unethical and illegal means" to promote sales of the PreDx test.  According to him, he was discharged because of his refusal to use these "unethical and illegal means."  Second Amended Complaint ¶¶ 66-68.

14

Hidalgo contends that Tethys' direction regarding the use of gift cards violated two federal statutes and, as such, contravened the public policy of Tennessee.  Tethys disagrees that its actions violated any statute - - federal or otherwise - - but argues that, in any event, federal public policy cannot be used to support a claim for retaliatory discharge under Tennessee law.

Tennessee courts have long adhered to the employment-at-will doctrine for employment relationships that do not have a definite term.  Crews v. Buckman Labs. Int'l, Inc., 78 S.W.3d 852, 857 (Tenn. 2002).  Generally, under this doctrine, either the employer or the employee can terminate the relationship "at any time for good cause, bad cause, or no cause."  Id. (quoting Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 574 (Tenn. 1999)).  "[T]he traditional at-will rule is not absolute; restrictions have been imposed upon the right of an employer to terminate an employee when the employee is discharged in contravention of well-defined and established public policy."  Guy v. Mutual of Omaha Ins. Co., 79 S.W.3d 528, 535 (Tenn. 2002)

To recover on a common law claim of retaliatory discharge in Tennessee, a plaintiff-employee must show: (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional

15

right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.  Guy v. Mutual of Omaha Ins. Co., 79 S.W.3d 528, 535 (Tenn. 2002).

Pointing to a refusal to violate the law is not enough; an employee must also show that the illegal activity or violation by the employer "implicate[s] important public policy concerns." Williams v. Greater Chattanooga Public Television Corp., 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) (Plaintiff "must not only show that she believed that copying the report was illegal but that her refusal to do so serves a public purpose that should be protected.") (internal quotations omitted).

> Not every violation of the law is sufficiently consequential to support an action for wrongful termination.  See Franklin, 210 S.W.3d at 531 ("[I]t was not enough ... to simply show that the employer violated a law or regulation.") Instead, a plaintiff must demonstrate that his actions have furthered "some 'important public policy interest embodied in the law.'"  Id. (quoting Guy, 79 S.W.3d at 538).  The public policy implicated must be "fundamental." Vancleave, 2009 Tenn.App. LEXIS 724, 2009 WL 3518211 at *11.  To determine what constitutes a fundamental element of Tennessee public policy, courts consider "the constitution and the laws, and the course of administration and decision." Stein v. Davidson Hotel Co., 945 S.W.2d 714, 717 (Tenn. 1997) (internal quotation marks and citations omitted). The Plaintiff is the master

of his Complaint and, therefore, bears the
responsibility of pointing the Court to statutory
provisions or administrative regulations evincing
the public policy position he claims for his
protection. <u>Vancleave</u>, 2009 Tenn.App. LEXIS 724,
2009 WL 3518211 at *12.

<u>McClaren v. Keystone Memphis, LLC</u>, No. 08-2806, 2010 WL 56084, *4
(W.D. Tenn. Jan. 5, 2010).

In <u>VanCleave v. Reelfoot Bank</u>, No. W2008-01559-COA-R3-CV,
2009 WL 3518211, *4 (Tenn. Ct. App. Oct. 30, 2009), the court
considered whether an employee's refusal to violate certain
federal statutes and regulations implicated fundamental Tennessee
public policy concerns. At issue in <u>VanCleave</u> was the federal
Bank Secrecy Act and its attendant regulations and whether they
evidence an important public policy. <u>See</u> <u>id.</u> at 5. In
considering the issue, the <u>VanCleave</u> court considered the
legislative history of the Act and found that the Act and its
regulations "were apparently intended by Congress to aid
investigations of criminal, tax, and regulatory violations,
including criminal acts such as money laundering and tax evasion
. . . [and, therefore] implicate a clear public policy or illegal
activity affecting public health, safety, and welfare." <u>Id.</u> at
6.

In this case, Hidalgo has not even attempted to tie
Tethys' alleged violation of federal law to the public policy of
Tennessee or engaged in the sort of analysis undertaken in
<u>VanCleave</u>. However, this court need not decide whether the

17

alleged violation of federal law, without more, violates the public policy of Tennessee because there is insufficient evidence to show that Tethys required Hidalgo to violate the law or be terminated for a failure to do so.  Hidalgo contends that Tethys' direction regarding the use of gift cards violated two federal statutes.

First, he argues that Tethys' practices in this regard violated 42 U.S.C. § 1395nn(a)(1), the Stark Act.  "The Stark Act, also referred to as the Physician Self-Referral Law, prohibits two things if a physician or member of his or her immediate family has a direct or indirect `financial arrangement with an entity:' (1) the physician `may not make a referral to the entity of certain designated health services' covered by the Medicare program; and (2) the entity `may not present or cause to be presented' a claim to Medicare for any such services following any such referral." U.S. v. Center for Diagnostic Imaging, Inc., 787 F. Supp.2d 1213, 1224 (W.D. Wash. 2011) (quoting 42 U.S.C. § 1395nn(a)(1)(A) and (B)); see also Braun v. Promise Regional Medical Center-Hutchinson, Inc., No. 11-2180-RDR, 2011 WL 6304119, *3 (D. Kan. Dec. 16, 2011) (same).

By its plain terms, the Stark Act applies to physician referrals. Feldstein v. Nash Community Health Services, Inc., 51 F. Supp.2d 673, 686 (E.D.N.C. 1999) ("The Stark Act, a civil statute enacted at 42 U.S.C. § 1395nn, prohibits certain

18

physician referrals where the physician has a financial
relationship with the entity to which he is referring patients.")
(emphasis added).  Hidalgo does not even attempt to provide a
rationale as to how the section of the Stark Act cited by him, 42
U.S.C. § 1395nn(a)(1), should apply in this case given that
neither he nor Tethys is a physician.[6]

      Furthermore, the Stark Act does not regulate all
physician referrals but only those in which payment will be
sought from Medicare or other federal health care programs.  See
U.S. ex rel. Kosenske v. Carlisle HMA, Inc., No. 1:05-CV-2184,
2007 WL 3490537, *6 (M.D. Penn. Nov. 14, 2007), rev'd and
remanded on other grounds, 554 F.3d 88 (2009) ("[T]he Stark Act
prohibits a physician from referring patients to a health care
entity with which the physician has a "financial relationship"
for services covered by Medicare or other federal health care
programs.") (emphasis added); McDonnell v. Cardiothoracic &
Vascular Surgical Assocs., No C2-03-0079, 2004 WL 3733404, *9
(S.D. Ohio Aug. 3, 2004) ("Congress enacted Stark to address the

_____

      [6] Perhaps plaintiff is relying on 42 U.S.C. §
1395nn(a)(1)(B), which he neither cites nor quotes, as the source
of his public policy.  That section, assuming an improper
physician referral has been made, prohibits an entity from making
a claim to Medicare for any such services following any such
referral.  See 42 U.S.C. § 1395nn(a)(1)(B).  However, as will be
discussed infra, there is no evidence that Tethys encouraged
Hidalgo to violate the Stark Act because Tethys discouraged
Hidalgo from trying to obtain Medicare and/or Medicaid referrals.

strain placed on the Medicare Trust fund by overutilization of certain medical services by physicians who, for their own financial gain rather than their patients' medical needs, referred patients to entities in which the physicians held a financial interest."). There is no evidence in this case that Tethys encouraged Hidalgo to violate the Stark Act because, by his own admission, Tethys discouraged him from pursuing Medicare and Medicaid sales.

> Q:  The PreDx test was not going to be reimbursed by - -
>
> A:  I don't think so, HMOs. And then Medicare, too, they didn't want us to use any Medicare.
>
> Q:  Do you recall if the directive was not to do Medicare or to be aware that the company doesn't make a profit on Medicare, and that you're not going to be incentivized to - -
>
> A:  We were actually told to let physicians know we just couldn't do Medicare yet.

Hidalgo Depo. at 153-54. If there has been no violation of the Stark Act, "it is manifest that there can be no violation of any public policy expressed by this statute." Johnson v. Pepperidge Farm, Inc., No. 93-1386, 1994 WL 118100, *4 (4th Cir. Apr. 4, 1994).

Based on the foregoing, the Stark Act cannot provide a basis for Hidalgo's retaliatory discharge claim in violation of Tennessee's public policy.

Hidalgo also alleges that he was terminated for his refusal to violate the Medicare Anti-Kickback Act. Like the

Stark Act, the Anti-Kickback Act was enacted to "deter abuse of federal health care programs . . . ."  See U.S. ex rel. Kosenske v. Carlisle HMA, Inc., No. 1:05-CV-2184, 2007 WL 3490537, *5 (M.D. Penn. Nov. 14, 2007), rev'd and remanded on other grounds, 554 F.3d 88 (2009).  A defendant violates the Anti-Kickback Act when he "knowingly and willfully offers or pays any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . ." 42 U.S.C. § 1320a-7b.  "The Anti-Kickback Act reinforces the policies underlying the Stark Act through criminal sanctions." U.S. ex rel. Kosenske, 2007 WL 3490537 at *6.

Again, the evidence before the court is that Tethys did not encourage Hidalgo to violate the Medicare Anti-Kickback Act because it specifically deterred him from trying to obtain Medicare and Medicaid business.  Therefore, he cannot argue that he was discharged for his refusal to do so.  For this and other

reasons,[7] defendant's motion for summary judgment as to Count VI is GRANTED.

## Conclusion

Based on the foregoing, defendant's motion for summary judgment as to Richard Hidalgo was GRANTED as to Count VI.  It was DENIED in all other respects.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

---

[7] For example, even if Tethys did in fact encourage the use of gift cards when it was illegal to do so, Hidalgo's retaliatory discharge claim would still fail because he cannot show a causal connection between his refusal to do so and his termination.  See Counce v. Ascension Health, No. M2009-00741-COA-R3-CV, 2010 WL 786001, *5 n.6 (Tenn. Ct. App. Mar. 8, 2010) ("A plaintiff must demonstrate a causal link between her termination and the alleged protected activity to sustain a claim under any theory of retaliatory discharge. . . . A plaintiff may meet this requirement by presenting direct evidence of a causal link, such as where the employer was acting pursuant to an established policy or where the employer admitted the reason for the termination, or by compelling circumstantial evidence. . . . It is not sufficient, however, to merely show that the plaintiff'ts participation in protected activity was followed by a discharge from employment, even where the proximity in time between the two events is very short.") (internal citations and quotations omitted).

Hidalgo offers no _evidence_, other than his own self-serving explanation, to show that his discharge was in retaliation for his refusal to solicit business by using gift cards.  All of the _evidence_ in the record supports Tethys' position that Hidalgo was discharged for his job performance, i.e., failure to meet sales goals.  See Counce v. Ascension Health, No. M2009-00741-COA-R3-CV, 2010 WL 786001, *5 (Tenn. Ct. App. Mar. 8, 2010) (granting summary judgment in employer's favor in retaliatory discharge claim where "there is no evidence in the record to indicate that [employer's] termination of [employee] was based on a reason other than her inadequate work performance.").

It is SO ORDERED this 1st day of October, 2012.

ENTER:

David A. Faber
Senior United States District Judge