IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

TIM BROWN, et al.,

     Plaintiffs,

v.                       CIVIL ACTION NO. 1:10-1245

TETHYS BIOSCIENCE, INC.,

     Defendant.


**MEMORANDUM OPINION AND ORDER**

By Judgment Order entered on September 28, 2012, the court **GRANTED** defendant's motion for summary judgment as to plaintiff Michael A. Lillie, Jr.  (Doc. # 92).  Plaintiff filed a response in opposition to defendant's motion[1] and defendant filed a reply.  The reasons for that decision follow.

**I.  Background**

This case arises out of the circumstances leading to and surrounding plaintiff Michael Lillie's former employment with defendant Tethys Bioscience, Inc. ("Tethys").  Tethys is a start-up company supported by venture capital financing.  Deposition of

---

[1] Tethys filed four motions for summary judgment, one for each plaintiff, presumably because the claims for each plaintiff are governed by the laws of different states.  According to plaintiffs, "[s]ince the factual and legal arguments overlap, one response to these four motions is appropriate."  Plaintiffs' Memorandum in Opposition at 1.  However, whether because they chose to file only one brief in response to four motions or for some other reason, plaintiffs' memorandum fails to address many of the issues advanced in defendant's motion in a meaningful way.

Brian Best, August 3, 2011, at 117-18 (attached as Exhibit A to
Defendant's Motion for Summary Judgment).  In January 2009, Tethys
launched its first product, the PreDx Diabetes Risk Score
("PreDx").  Best Depo. at 16.  The PreDx uses blood tests to
determine a patient's risk of developing Type 2 diabetes within 5
years.  Deposition of Tricia Perks, August 2, 2011, at 30
(attached as Exhibit C to Defendant's Motion for Summary Judgment
and Exhibit C to Plaintiff's Memorandum in Opposition); Complaint
¶ 9.

A.    *Hiring of Lillie*

        Following the successful launch of PreDx in January 2009,
Tethys began to recruit additional salespersons.  Best Depo. at
16.  In approximately October 2009, Lillie, who at the time was
unemployed, had a telephone interview with Trish Perks, the
National Sales Director for Tethys.  Deposition of Michael Lillie,
August 4, 2011, at 61-62, 181 (Exhibit D to Defendant's Motion and
Exhibit A to Plaintiffs' Memorandum in Opposition); Perks Depo. at
9.  Lillie's signed employment application shows that he applied
for a position as a Regional Account Manager with Tethys on
November 2, 2009.  Lillie Depo. at 12-13.  Following the phone
interview, Lillie was invited to Chicago for an in-person
interview with both Perks and Bonnie Zell, a consultant with
Tethys who assisted with recruiting the sales team.  Lillie Depo.
at 61-62; Perks Depo. at 77; Deposition of Bonnie Zell, August 5,

2011, at 7-8 (Exhibit E to Defendant's Motion).  That interview took place on November 10, 2009.  Lillie Depo. at 62.

According to Lillie, during his interview, the subject of Tethys' contracts with LabCorp was discussed:

Q:  And you also testified that there was some discussion of laboratories?

A:  Yeah.

Q:  Do you remember - -

A:  I just remember that being brought up to help with the process, and LabCorp programs being set up around the United States to help out, and they would do the central sites for them, the draws and help out.

Q:  Well, to the best of your recollection, do you remember specifically what was said on the topic of laboratories?

A:  That they had LabCorp contracts in place, and they were - - we were supposed to help out with the, the uptake of the product through the - - I mean, how can I describe it?

Q:  Well, I'm not looking for you to describe it.  I'm trying to - -

A:  Well, I know - -

Q:  Let me just finish.  I'm trying to ask you now, to the best of your recollection, what either Ms. Perks or Ms. Zell said to you on the topic of laboratories?

A:  Yes, that they had LabCorp contracts in place, and that they were looking to start them in the East, and that they were coming into Seattle.  I can't remember what the time frame for that was, but that's what I distinctly remember.

* * *

Q:  And I believe it's your testimony that they were not in place for the Washington state area at this point?

3

Mr. McClanahan:  Object.  He didn't testify to that.

Q:  You said that they were coming to, I believe?

A:  I'm not sure what the time frame.  They weren't specific on that.

Q:  But if there's a time frame, that indicates to me that they were not in place as to the state of Washington at that time?

A:  Alls [sic] I know is that there was - - I guess I'll go back and say that they were going to start out in the Southeast.  I'm not sure.

Q:  Well, it sounds like you're not sure what Ms. Perks said then.  What, if anything, did Ms. Perks say about whether there was already a contract in place as to Washington state?  Isn't it true that she said something about a time frame?

A:  Well, I don't know how the program was going to be rolled out, but they just seemed very excited about it.  So I'm - -

Q:  . . . She said something to you, did she not, that indicated to you that there was a time frame before there would be a LabCorp contract in the state of Washington; is that correct?

A:  I'm trying to think how - - yes.

                    * * *

Q:  Did you raise the issue of LabCorp?

A:  No, I did not.

Q:  So it was - -

A:  Presented to me.

Q:  - - presented to you that there were contracts and that they were going to focus starting in the Southeast.  I believe that was your testimony?

A:  To the best of my - - I don't recall exactly, but I just remember that popping up.  I don't know exactly

4

what their game plan was, so I can't be specific on it.  I'm sorry.

Q:   Well, did it leave with you the impression that there were LabCorp contracts that covered some but not all territories that Tethys was operating in at that time?

A:   I guess, yeah.

Lillie Depo. at 66-71.

Lillie further testified:

Q:   And is it your testimony that you got a subsequent communication that the Washington state was in place?

A:   There might be an email on that.  I can't recollect.

Q:   Well, my question is, as best you can remember right now, did you have a subsequent discussion, at the training or otherwise, that caused you to believe there was a national contract in place?

A:   Yes.

Q:   When was that?

A:   That would probably go all the way back to the interview.

Q:   Back to the interview.

A:   In Chicago.

Q:   Okay.  And what were you told at the interview in Chicago?

A:   That we had LabCorp contracts in place.  They were excited about that.  That was Bonnie Zell and Trish Perks.

                              * * *

A:   . . . They didn't - - somewhere - - there wasn't - - all of a sudden it was - - they made it sound like it was completely in ink, inked it.  And then all of a

> sudden later down the line it was like, it's not
> happening.
>
> Q:   Mr. Lillie, you just now testified that they made it
>      sound like it was completely inked.  Is that what you
>      said?
>
> A:   I don't know to use the term.  I mean, I'm trying to
>      go back and recall to the best of my knowledge
>      exactly how we had it focused.  And I'm trying to be
>      straight.

Lillie Depo. at 118, 121.

Perks denies telling Lillie that a national contract with LabCorp was in place during her interview or at any other time. Perks Depo. at 121.  According to Perks, any conversation regarding a LabCorp contract would have been limited to the existence of a pilot program.  Perks Depo. at 77.

Lillie later interviewed with Brian Best, the then-Vice-President of Commercial Operations in Las Vegas, Nevada, on December 2, 2009.  Lillie Depo. at 76, 79-80.  Following this meeting, Tethys made Lillie an offer of employment, which he accepted.  Lillie Depo. at 80-81.  Lillie began working at Tethys on December 7, 2009.  Lillie Depo. at 80-81.

B.   *Lillie's Performance*

Throughout his employment with Tethys, Lillie never met his sales goals.  Lillie Depo. at 99, 102, 139, 160.  On July 23, 2010, Lillie was placed on a Performance Improvement Plan ("PIP") due to ongoing sales deficiencies.  Lillie Depo. at 136-37.  Under the terms of the PIP, Lillie had to generate a certain number of

sales by August 6, 2010, or his employment with Tethys would be terminated.  Lillie Depo. at 136-37 and Exhibit 6 to Lillie's Deposition.  Lillie signed the PIP and showed some improvement, although he did not meet his sales goals.  Lillie Depo. at 144-45. He was not terminated on August 6, 2010, but his performance improvement period was extended.  Lillie Depo. at 149.  When he failed to make his sales goals for the next month, he was terminated on September 1, 2010.  Lillie Depo. at 149, 155, 160.

C.     *Use of Gift Cards and Other Methods to Generate Sales*

Lillie claims that he was told to "do what it takes, do whatever you have to do" to generate sales of PreDx.  Lillie Depo. at 168-69.  In particular, he claims that he was told by Tethys management to incentivize offices to obtain sales, including the use of gift cards and other enticements.  Lillie Depo. at 168-69. Lillie doesn't recall ever notifying Tethys of his objection to using gift cards or other enticements to make sales.  Lillie Depo. at 169.

According to Best, the practice of using gift cards to generate sales was not approved or encouraged by Tethys.  Best Depo. at 70.  When Seneca Garrett, a Regional Account Manager with Tethys, admitted to using gift cards to get business, Best directed Garrett's supervisor to notify Garrett that it was not appropriate to use gift cards to induce sales.  Best Depo. at 70.

D.      *Procedural History*

        On or about September 23, 2010, Lillie, along with Tim Brown, Richard Hidalgo, Valerie Honaker, and Bonnie Weiss (collectively "Plaintiffs"), filed the instant action against Tethys in the Circuit Court of Mercer County.  On October 21, 2010, Tethys removed the case to this court on the basis of diversity jurisdiction.  All of the remaining plaintiffs[2] except for Weiss are residents of states other than West Virginia. Lillie is a resident of Washington.  Second Amended Complaint at ¶ 2.  On March 30, 2012, the court granted plaintiffs' second motion to amend which sought to add Cynthia Walker, a resident of Indiana, as a plaintiff and assert claims for negligence and negligent misrepresentation.

        Plaintiffs' Second Amended Complaint contains four claims relevant to Lillie:  Actual and/or Constructive Fraud (Count I), Negligent Misrepresentation (Count II), Negligent Supervision and/or Training (Count III), and Retaliatory Discharge (Count V). The instant motion seeks judgment in Tethys' favor on all the claims asserted by Lillie.

<u>**Summary Judgment Standard**</u>

        Rule 56 of the Federal Rules of Civil Procedure provides:

───────────────

        [2] A Stipulation of Dismissal, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), as to plaintiff Tim Brown was filed on June 8, 2011.

> The judgment sought shall be rendered
> forthwith if the pleadings, depositions,
> answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, show that there is
> no genuine issue as to any material fact
> and that the moving party is entitled to
> a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial. Id. at 322. If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there
> must be evidence on which the jury could
> reasonably find for the plaintiff.  The
> judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could
> find, by a preponderance of the
> evidence, that the plaintiff is entitled
> to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 250-51.

## **Analysis**

A.      *Fraud*

        According to Lillie, Tethys committed fraud[3] when it
informed him during his interview that:

> laboratory contracts were in place "to help with
> the process," that "LabCorp programs [were] being
> set up around the United States," and that
> LabCorp "would do the central sites for them, the
> draws."  Defendant's interviewers specifically
> stated that "they had LabCorp contracts in
> place."  The interviewers "made it sound like it
> was completely in ink, inked it."

Plaintiffs' Memorandum in Opposition, p. 3.  Tethys denies making
any misrepresentation.

        Under Washington law, the nine essential elements of
fraudulent or intentional misrepresentation are:

(1) representation of an existing fact; (2) its materiality; (3)
its falsity; (4) the speaker's knowledge of its falsity; (5) the
speaker's intent that it shall be acted upon by the plaintiff;
(6) plaintiff's ignorance of its falsity; (7) plaintiff's

---

        [3] In Washington, the terms "intentional misrepresentation,"
and "fraud are synonymous.  Sadler v. State Farm Mutual
Automobile, Ins. Co., No. C07-995Z, 2007 WL 2778257, *3 n.5 (W.D.
Wash. Sept. 20, 2007) ("The parties agree that the elements of
intentional misrepresentation or fraud in Washington are. . .
."); Carlile v. Harbour Homes, Inc., 194 P.3d 280, 285 (Wash.
App. Div. 1 Oct. 20, 2008)("The nine elements of intentional
misrepresentation (fraud) are . . . .").

reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) consequent damages suffered by plaintiff.  Stiley v. Block, 925 P.2d 194, 204 (Wash. 1996). Under Washington law, each element of fraud must be established by "clear, cogent, and convincing evidence." Id.; see also Brown v. Underwriters at Lloyd's, 332 P2d 228, 230 (Wash. 1958) ("[F]raud is never presumed, but must be proved by clear, cogent and convincing evidence.").

Lillie's intentional misrepresentation claim fails because he has not shown a false representation of an existing fact.  Lillie's own brief acknowledges that Lillie was told "LabCorp programs [were] being set up around the United States." When Lillie's testimony is viewed in its entirety, it is clear that he understood the situation with LabCorp contracts was fluid and that there was no definite date for a LabCorp contract in the state of Washington. "The allegedly fraudulent misrepresentations by [Tethys] are, even when viewed in the light most favorable to [Lillie], taken out of context and amount to no factual showing of intentional misrepresentation." Dickson-McFerran Properties v. Mackie, No. 21253-6-II, 1997 WL 633947, *3 (Wash. App. Div. 2 Oct. 10, 1997).

Furthermore, "[a] promise of future performance is not a representation of an existing fact and will not support a fraud claim." West Coast, Inc. v. Snohomish County, 48 P.3d 997, 1000

11

(Wash. App. Div. 1 May 6, 2002); Maid O'Clover, Inc. v. Chevron USA, Inc., No. CV-03-3077-EFS, 2005 WL 2267271, *3 (E.D. Wash. Sept. 16, 2005)("[P]romissory statements of future performance or potentially occurring events are not typically actionable under a theory of negligent misrepresentation."). The only exception to this rule is where the "promise is made without care or concern whether it will be kept, and the promisor knows or under the circumstances should know that the promisee will be induced to act or refrain from acting to his detriment, the promise will . . . support an action by the promisee." Maid O'Clover, 2005 WL 2267271, at *3 (quoting Markov v. ABC Transfer & Storage Co., 76 Wash.2d 388, 396, 457 P.2d 535 (1969)). In this case, there is no allegation, much less evidence, that any promise regarding LabCorp contracts was made without care or concern whether it would be kept.

Moreover, "`[t]he right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him.'" Skagit State Bank v. Rasmussen, 109 Wash.2d 377, 384, 745 P.2d 37 (1987) (quoting Williams v. Joslin, 65 Wash.2d 696, 698, 399 P.2d 308 (1965)). A review of Lillie's testimony in this matter demonstrates that any reliance by him on the alleged misrepresentations concerning LabCorp contracts would not be

12

reasonable because it is clear that he did not really understand exactly what was entailed or when it would happen.

Finally, the court would note that there is no evidence in the record that Lillie actually relied on any representations regarding the existence of LabCorp contracts in accepting his position with Tethys.  He did not testify that the representations regarding the LabCorp contracts actually induced him to take the job or had he known the "true facts" that he would not have taken the position.

Given the foregoing, Tethys is entitled to summary judgment in its favor on Lillie's fraud claim.

B.      *Negligent Misrepresentation*

Under Washington law, the essential elements of negligent misrepresentation are (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.  Prime Real Estate Closing & Escrow, LLC v. Heberling, Heberling Homes, No. 29454-4-III, 2011 WL 3444578, *5

13

(Wash. App. Div. 3 Aug. 9, 2011) (citing <u>Bloor v. Fritz</u>, 143 Wn. App. 718, 734, 180 P.3d 805 (2008)).

As discussed above, Lillie has not shown that a genuine issue of material fact exists regarding a false representation of fact by Tethys.  Therefore, Tethys in entitled to judgment in its favor on the negligent misrepresentation as well.  Accordingly, the motion for summary judgment as to Count II is **GRANTED**.

C.    *Negligent Training/Negligent Supervision*

In support of his negligence claim, Lillie contends that Tethys breached a duty of care owed to him by "(a) fail[ing] to adequately train its interviewers, and/or (b) fail[ing] to adequately inform its interviewers regarding the existence of contracts with medical laboratories and agreements with HMO's, and/or (c) failed to use reasonable care and to exercise due diligence in determining the existence of contracts with medical laboratories and agreements with HMO's prior to making affirmative statements on the subject."  Second Amended Complaint ¶ 42.  Stated another way, Lillie contends that Tethys was negligent in its training and/or supervision of its interviewers.[4]

---

[4] Lillie's contention that Tethys failed to use reasonable care and due diligence in determining the existence of contracts with medical laboratories prior to making affirmative statements on the subject is actually just a restatement of his negligent misrepresentation claim and does not support a separate claim for negligence.

14

"Under Washington law, . . . a claim for negligent hiring, training, and supervision is generally improper when the employer concedes the employee's actions occurred within the course and scope of employment." Niece v. Elmview Grp. Home, 929 P.2d 420, 425-26 (Wash. 1997); see also Johnson v. US Bancorp, No. 11-35667, 2012 WL 3575299, *1 (9th Cir. Aug. 21, 2012) ("Because the Bank employees were acting within the scope of their employment at all times, their claim of negligent supervision too must fail."); Saldana v. City of Lakewood, No. 11-CV-06066, 2012 WL 2568182, *3 (W.D. Wash. Jul. 2, 2012)("Washington law is also clear: where the parties agree that an employee acted within the scope of employment, a negligent training, hiring, or supervision claim against the employer is 'redundant.'"); Disnute v. City of Puyallup, No. 3:10-cv-05295-RBL, 2012 WL 1237575, *4 (W.D. Wash. Apr. 12, 2012) ("The city has admitted agency for this purpose; thus, the negligent training, hiring, and supervising claims are `immaterial' because these causes of action apply only when an employee acts outside the scope of employment."); Armijo v. Yakima HMA, LLC, No. 11-CV-03114-TOR, 2012 WL 1205867, *6 (E.D. Wash. Apr. 11, 2012) ("In Washington, a cause of action for negligent supervision requires a plaintiff to show that an employee acted outside the scope of his or her employment."). Therefore, a cause of action for negligent hiring, training, and/or supervision requires a

plaintiff to show that an employee acted outside the scope of his or her employment.[5]

In this case, there is no question that Perks, Zell, and Best were acting within the scope of their employment with Tethys when they interviewed plaintiff.  Accordingly, his negligent training and supervision claims fail under Washington law.

D.      *Retaliatory Discharge*

Lillie contends that Tethys encouraged him to use gift cards and other "unethical and illegal means" to promote sales of the PreDx test.  According to him, he was discharged because of his refusal to use these "unethical and illegal means."  Second Amended Complaint ¶¶ 66-68.

Under Washington law, "[a]bsent a definite contract, employment relationships are generally terminable at will. . . . [T]he tort of wrongful discharge in violation of public policy is a narrow exception to the employment at-will doctrine."  <u>Cudney v. Alsco, Inc.</u>, 259 P.3d 244, 246 (Wash. 2011) (internal citations and quotations omitted).

> To prevail on a wrongful discharge claim, a plaintiff must satisfy a four-factor test. Specifically, the plaintiff must show: (1) the existence of a clear public policy (the clarity element); (2) that discouraging the conduct in which [he] engaged would jeopardize the public

---

[5] When an employee commits negligence within the scope of employment, a different theory of liability - - vicarious liability - - applies. <u>See</u> <u>LaPlant v. Snohomish County</u>, 162 Wash. App. 476, 271 P.3d 254, 256 (2011).

> policy (the jeopardy element); (3) that the
> public-policy-linked conduct caused the dismissal
> (the causation element); and, finally, (4) that
> [t]he defendant [has not] offer[ed] an overriding
> justification for the dismissal (the absence of
> justification element).  These elements are
> conjunctive, meaning that all four elements must
> be proved.

Id. (internal citations and quotations omitted).  Washington

courts have consistently held "that the wrongful discharge tort

is narrow and should be applied cautiously."  Id.

Tethys contends that Lillie cannot satisfy the "clarity"

element in that he has not shown the existence of a clear public

policy.  Lillie does not even address Washington's four-part

test, much less attempt to show that he can satisfy each element.

> Whether or not a clear mandate of public
> policy exists, sufficient to meet the first
> element of the [four-part] test, is a question of
> law.  This court has found Washington statutes
> and case law to be primary sources of Washington
> public policy.  In addition we have occasionally
> found other sources of public policy to be
> adequate.  For example this court recognized that
> a municipal fire code was sufficient to establish
> a public policy against disabling a fire system
> without proper authorization.  Similarly, the
> Thompson court found that adequate public policy
> existed in the federal FCPA to support a state
> tort claim of wrongful discharge.

Sedlacek v. Hillis, 36 P.3d 1014, 1018-19 (Wash. 2001) (internal

citations omitted).  The Sedlacek court continued:

> Despite this court's acceptance of a federal
> statute as a source of public policy in Thompson,
> we cannot conclude that a clear mandate of public
> policy exists merely because the plaintiff can
> point to a potential source of public policy that
> addresses the relevant issue. In order to ensure

17

that we can balance the interests of employer and
employee, and to ensure judicial restraint, we
have imposed additional limitations on the
establishment of public policy.  For example, the
asserted policy must be truly public.
Furthermore, the asserted public policy must be
clear.

We also recognize that the wrongful discharge
exception should be applied cautiously in order
to avoid allowing an exception to swallow the
general rule that employment is terminable at
will.  Further, the Legislature is the
fundamental source for the definition of this
state's public policy and we must avoid stepping
into the role of the Legislature by actively
creating the public policy of Washington.  "This
court should resist the temptation to rewrite an
unambiguous statute to suit our notions of what
is good public policy, recognizing the principle
that 'the drafting of a statute is a legislative,
not a judicial, function.'"  State v. Jackson,
137 Wash.2d 712, 725, 976 P.2d 1229 (1999)
(quoting State v. Enloe, 47 Wash. App. 165, 170,
734 P.2d 520 (1987)).  An argument for the
adoption of a previously unrecognized public
policy under Washington law is better addressed
to the Legislature.  Id. at 725, 976 P.2d 1229;
see also Roberts, 140 Wash.2d at 79, 993 P.2d 901
(Talmadge, J., concurring) ("The specter of
judicial activism is unloosed and roams free when
a court declares, 'This is what the Legislature
meant to do or should have done.'").  Therefore,
we should not create public policy but instead
only recognize clearly existing public policy
under Washington law.

Id. at 1019-20.

Lillie contends that Tethys' direction regarding the use

of gift cards violated two federal statutes and, as such,

contravened the public policy of Washington.  Tethys disagrees

that its actions violated any statute - - federal or otherwise -

- but argues that, in any event, federal public policy cannot be

used to support a claim for retaliatory discharge under
Washington law.

In this case, Lillie has not even attempted to tie
Tethys' alleged violation of federal law to the public policy of
Washington nor has he attempted to satisfy the jeopardy and
causation elements.  However, this court need not decide whether
the alleged violation of federal law, without more, violates the
public policy of Washington[6] because there is insufficient
evidence to show that Tethys required Lillie to violate the law
or be terminated for a failure to do so.  Lillie contends that
Tethys' direction regarding the use of gift cards violated two
federal statutes.

First, he argues that Tethys' practices in this regard
violated 42 U.S.C. § 1395nn(a)(1), the Stark Act.  "The Stark
Act, also referred to as the Physician Self-Referral Law,
prohibits two things if a physician or member of his or her
immediate family has a direct or indirect `financial arrangement
with an entity:' (1) the physician `may not make a referral to

---

[6] Washington recognizes a public policy wrongful discharge
action in four general areas: "(1) where employees are fired for
refusing to commit an illegal act; (2) where employees are fired
for performing a public duty or obligation, such as serving jury
duty; (3) where employees are fired for exercising a legal right
or privilege, such as filing workers' compensation claims; and
(4) where employees are fired in retaliation for reporting
employer misconduct, i.e., whistleblowing.  Roe v. Teletech
Customer Care Management (Colorado) LLC, 257 P.3d 586, 595 (Wash.
2011).

the entity of certain designated health services' covered by the Medicare program; and (2) the entity `may not present or cause to be presented' a claim to Medicare for any such services following any such referral.  U.S. v. Center for Diagnostic Imaging, Inc., 787 F. Supp.2d 1213, 1224 (W.D. Wash. 2011) (quoting 42 U.S.C. § 1395nn(a)(1)(A) and (B)); see also Braun v. Promise Regional Medical Center-Hutchinson, Inc., No. 11-2180-RDR, 2011 WL 6304119, *3 (D. Kan. Dec. 16, 2011) (same).

By its plain terms, the Stark Act applies to physician referrals.  Feldstein v. Nash Community Health Services, Inc., 51 F. Supp.2d 673, 686 (E.D.N.C. 1999) ("The Stark Act, a civil statute enacted at 42 U.S.C. § 1395nn, prohibits certain physician referrals where the physician has a financial relationship with the entity to which he is referring patients.") (emphasis added).  Lillie does not even attempt to provide a rationale as to how the section of the Stark Act cited by him, 42 U.S.C. § 1395nn(a)(1), should apply in this case given that neither he nor Tethys is a physician.[7]

---

[7]Perhaps plaintiff is relying on 42 U.S.C. § 1395nn(a)(1)(B), which he neither cites nor quotes, as the source of his public policy.  That section, assuming an improper physician referral has been made, prohibits an entity from making a claim to Medicare for any such services following any such referral.  See 42 U.S.C. § 1395nn(a)(1)(B).  However, as will be discussed infra, there is no evidence that Tethys encouraged Lillie to violate the Stark Act because Tethys discouraged Lillie from trying to obtain Medicare and/or Medicaid referrals.

Furthermore, the Stark Act does not regulate all physician referrals but only those in which payment will be sought from Medicare or other federal health care programs.  See U.S. ex rel. Kosenske v. Carlisle HMA, Inc., No. 1:05-CV-2184, 2007 WL 3490537, *6 (M.D. Penn. Nov. 14, 2007)("[T]he Stark Act prohibits a physician from referring patients to a health care entity with which the physician has a "financial relationship" for services covered by Medicare or other federal health care programs.") (emphasis added); McDonnell v. Cardiothoracic & Vascular Surgical Assocs., No C2-03-0079, 2004 WL 3733404, *9 (S.D. Ohio Aug. 3, 2004) ("Congress enacted Stark to address the strain placed on the Medicare Trust fund by overutilization of certain medical services by physicians who, for their own financial gain rather than their patients' medical needs, referred patients to entities in which the physicians held a financial interest.").  There is no evidence in this case that Tethys encouraged Lillie to violate the Stark Act because, by his own admission, Tethys discouraged him from pursuing Medicare and Medicaid sales.

> Q:    Were you ever urged or, excuse me, instructed to urge medical providers not to order PreDx for Medicare and Medicaid patients?
>
> A:    Yes.
>
> * * *
>
> Q:    And just to be clear in my prior question, I'm not talking about simply saying, we don't make money on

> this or we're not paying you a bonus on this.  I'm
> talking about an instruction that you are to urge
> the doctor, at the doctor level, don't order PreDx
> for Medicare or Medicaid.  Did that happen?
>
> A:   For me to say it?
>
> Q:   Did someone instruct you along those lines?
>
> A:   We were told at the meeting not to target for those
> doctors.
>
> Q:   Not to target for those doctors?
>
> A:   Not call on those doctors.
>
> Q:   Okay.  Not to call on those doctors?
>
> A:   Right.  I'm trying to be more succinct for you.

Lillie Depo. at 167-68.  If there has been no violation of the

Stark Act, "it is manifest that there can be no violation of any

public policy expressed by this statute."  Johnson v. Pepperidge

Farm, Inc., No. 93-1386, 1994 WL 118100, *4 (4th Cir. Apr. 4,

1994).

Based on the foregoing, the Stark Act cannot provide a

basis for Lillie's retaliatory discharge claim in violation of

Washington's public policy.

Lillie also alleges that he was terminated for his

refusal to violate the Medicare Anti-Kickback Act.  Like the

Stark Act, the Anti-Kickback Act was enacted to "deter abuse of

federal health care programs . . . ."  See U.S. ex rel. Kosenske

v. Carlisle HMA, Inc., No. 1:05-CV-2184, 2007 WL 3490537, *5

(M.D. Penn. Nov. 14, 2007), rev'd and remanded on other grounds,

554 F.3d 88 (2009).  A defendant violates the Anti-Kickback Act when he "knowingly and willfully offers or pays any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . ." 42 U.S.C. § 1320a-7b.  "The Anti-Kickback Act reinforces the policies underlying the Stark Act through criminal sanctions." U.S. ex rel. Kosenske, 2007 WL 3490537 at *6.

Again, the evidence before the court is that Tethys did not encourage Lillie to violate the Medicare Anti-Kickback Act because it specifically deterred him from trying to obtain Medicare and Medicaid business.  Therefore, he cannot argue that he was discharged for his refusal to do so.  For this and other

reasons,[8] defendant's motion for summary judgment as to Count V is GRANTED.

### Conclusion

Based on the foregoing, defendant's motion for summary judgment as to Michael Lillie was **GRANTED**.

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED this 1st day of October, 2012.

ENTER:

*David A. Faber*

David A. Faber
Senior United States District Judge

---

[8] For example, even if Tethys did in fact encourage the use of gift cards when it was illegal to do so, Lillie's retaliatory discharge claim would still fail because he cannot show a causal connection between his refusal to do so and his termination. Lillie offers no evidence, other than his own self-serving explanation, to show that his discharge was in retaliation for his refusal to solicit business by using gift cards.  All of the evidence in the record supports Tethys' position that Lillie was discharged for his job performance, i.e., failure to meet sales goals and, therefore, Tethys can show "an overriding justification for the dismissal."  See Cornelio v. Premier Pacific Seafoods, Inc., No. 54445-4-I, 2005 WL 1331205, *7 (Wash. App. Div. 1 May 23, 2005) (affirming dismissal of wrongful discharge cause of action where defendant offered "persuasive defenses" that were an overriding justification for the dismissal).