IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

TIM BROWN, et al.,

     Plaintiffs,

v.                        CIVIL ACTION NO. 1:10-1245

TETHYS BIOSCIENCE, INC.,

     Defendant.

MEMORANDUM OPINION AND ORDER

By Judgment Order entered on September 28, 2012, the court **GRANTED** in part and **DENIED** in part defendant's motion for summary judgment as to defendant Bonnie Weiss.  (Doc. # 98).  Plaintiff filed a response in opposition to defendant's motion[1] and defendant filed a reply.  The reasons for that decision follow.

I.  Background

This case arises out of the circumstances leading to and surrounding plaintiff Bonnie Weiss' former employment with defendant Tethys Bioscience, Inc. ("Tethys").  Tethys is a start-up company supported by venture capital financing.  Deposition of

_____

[1] Tethys filed four motions for summary judgment, one for each plaintiff, presumably because the claims for each plaintiff are governed by the laws of different states.  According to plaintiffs, "[s]ince the factual and legal arguments overlap, one response to these four motions is appropriate."  Plaintiffs' Memorandum in Opposition at 1.  However, whether because they chose to file only one brief in response to four motions or for some other reason, plaintiffs' memorandum fails to address many of the issues advanced in defendant's motion in a meaningful way.

Brian Best, August 3, 2011, at 117-18 (attached as Exhibit A to Defendant's Motion for Summary Judgment).  In January 2009, Tethys launched its first product, the PreDx Diabetes Risk Score ("PreDx").  Best Depo. at 16.  The PreDx uses blood tests to determine a patient's risk of developing Type 2 diabetes within 5 years.  Deposition of Tricia Perks, August 2, 2011, at 30 (attached as Exhibit C to Defendant Michael Lillie's Motion for Summary Judgment and Exhibit C to Plaintiff's Memorandum in Opposition); Complaint ¶ 9.

A.    *Hiring of Weiss*

Following the successful launch of PreDx in January 2009, Tethys began to recruit additional salespersons.  Best Depo. at 16.  After Weiss was recommended as a candidate for a position as a Regional Account Manager ("RAM") in West Virginia, Tethys contacted Weiss to set up an interview.  Deposition of Bonnie Weiss, June 29, 2011, at 7-8 (Exhibit C to Defendant's Motion and Exhibit A to Defendant's Reply Brief).  On November 23, 2009, Weiss interviewed with Bonnie Zell, a consultant with Tethys who assisted with recruiting the sales team, and Tricia Perks, who was the National Sales Director at that time.  Weiss Depo. at 16; Deposition of Bonnie Zell, August 5, 2011, at 7-8 (Exhibit D to Defendant's Motion); Deposition of Trisha Perks, August 2, 2011, at 9, 60 (Exhibit B to Defendant's Motion and Exhibit C to Plaintiff's Memorandum in Opposition).

According to Weiss, during her interview, the subject of Tethys' contracts with LabCorp was discussed:

Q:   What did they tell you about the pay for the job?

A:   They told me the starting salary would be 115, and that I would be offered bonuses, and this is when they offered up the fact that the rep in Charlotte was making $250,000 a year.

* * *

Q:   And did you do any follow-up questions about the rep in Charlotte?

A:   Oh, I asked how in the world he did that, of course. And they said that he had contracts with LabCorp, and with Carilion, and that by having those contracts in place that he would be able to continue because they would actually do the blood draws for them.

Q:   What was the exact language they told you, if you can recall, that he had contracts with LabCorp?  Is this something he had personally arranged?

A:   No, not necessary.  They - - I don't remember the exact language, the verbatim discussion, but basically what they told me was that Jeff was doing really well because he had contracts with LabCorp and Carilion in his offices where they would draw the blood.

And I said, is that available to all of us?  Will we all have these contracts, and Trisha's answer was, yes.

* * *

Q:   When Trisha said, answered your question that the LabCorp contract was available to all of us, did she indicate the status of the arrangement with LabCorp - -

A:   Yes, she did.  She said, it is fully in North Carolina from what Jeff had set up and already started, and that they were doing at that time, and this is in November, and that they were actually

3

running a pilot program, and that it was expected to launch throughout the country in December or throughout specific areas that they allotted as their territories in December.

Q:  Did she indicate that North Carolina was part of this pilot program?

A:  Yes.

Q:  Did you ask her if West Virginia was part of the program?

A:  Of course, yes, and it was not.

Q:  Did you ask her what other territories were subject to the pilot program with LabCorp?

A:  Absolutely.  And she said, all of the territories that we are filling at this point.  So all of the open territories then, they were expansion territories, like West Virginia.

Q:  Okay.  I'm a little confused then.  I thought you just told me West Virginia was not a part of the  - -

A:  Pilot program.  It was not.

Q:  But there was something planned in the future for West Virginia; is that what you're saying?

A:  Once the contract was signed, it was no longer a pilot program at that point.  It would be fully in place, and they were anticipating that would happen in December, and West Virginia would be included in it.

Q:  Did you ask what the status of the contract negotiations with LabCorp were?

A:  I did.  And they were extremely favorable, was the terminology that she used.

   So they were expecting, she was expecting everything to be finalized in December.

* * *

4

Q:   Did Trisha indicate to you that there was a
     particular date when the arrangement with LabCorp
     would be finalized?

A:   She said in December.

Q:   Do you know when?

A:   No, I don't.

Weiss Depo. at 20-24.  Weiss further testified:

Q:   What do you consider to be faulty information?

A:   Telling us that the LabCorp contracts would be
     available, and that they had the contracts at LabCorp
     in the process of being signed, and that we would
     have the LabCorp agreements.

Q:   When you said Trisha Perks told you there was a
     signed contract, was that prior to you going to work
     for Tethys or after you went to work for Tethys on
     December 14th?

A:   Both.  Both.  She said before we started – – I asked
     her about Jeff Ehrlich, and how he was doing it.

         And she said, He is in the pilot study, and is
     doing huge numbers because he has a pilot study with
     LabCorp.

         My question was, Is that going to apply to me; am
     I going to have that?

         And she said, Yes, the contract is at LabCorp
     being signed as we speak, and it should be signed any
     time.  And then she continued to say that until about
     – – even at the training, in the training class.

                         *  *  *

Q:   But the call you referred to from Ms. Perks was that,
     We have a contract, was that after your hire date?

A:   It was during the interview process.

Q:   She told you there was an absolute, signed contract
     with LabCorp?

5

A:    Not an absolute, signed contract.  She said, it is
      going to be a signed contract.

Q:    So when did you learn there was there [sic] a signed
      contract; if you ever did?

A:    There isn't one.  There still isn't one.

Q:    Well, when did you have the conversation with Ms.
      Perks when you allege that she said there was a
      signed contract?

A:    She told us in - - she told me in the interview
      process that the contract for the pilot study, that
      Jeff Ehrlich was doing in Charlotte, would be
      applicable in West Virginia.

           Those were her words, It will be applied to your
      customers, and you will have access to that LabCorp
      account as soon as we just finish up a little
      paperwork.  That was the interview process.

                       *  *  *

A:    But my next question was, Will we have this LabCorp
      pilot study extended into West Virginia for the
      contract?

           And she said, Yes, absolutely.  Everything is in
      place to expand as we speak.  The contract is at
      LabCorp pending a signature, and you will have that.
      She was very, very confident.

Q:    But then you just told me, but we have to finish up
      the paperwork?

A:    But they had not signed.  They had to get the
      signature from LabCorp to expand it.

Q:    Did she expand on what she meant by the paperwork?

A:    I don't remember her doing that, but my assumption
      was that she was talking about the contract.

Weiss Depo. at 69-73.

Upon further questioning regarding exactly what Ms. Perks told her about the existence of national contracts with LabCorp, Weiss stated:

> A:   I think it was extremely reckless of Trisha Perks to be misleading as far as contracts that were available and insurance coverages in West Virginia

> * * *

>    Basically, to me they willfully knew and willfully told us knowing that these contracts were not in place.  And knowing that they could not do business without that, and expecting the people they hired to perform a job and reach goals that could not be reached without that background material in place.

> Q:   But they never told you at the time you were hired that there was a contract in place; correct?

> A:   No, they did.  She definitely said - - she had the pilot study.  She says, we have this national contract.

> Q:   But it was a pilot study; correct?

> A:   Yes.  But in her mind - -

> Q:   But it was just for a small number of territories; correct?

> A:   Well, that's what the - - yeah, that's what the paperwork said.  But she said to me, we have this national contract.

> Q:   But you knew that it was just a pilot contract?

> A:   Well, I didn't read it.  But what she told me is that it was a pilot now, but it is being extended into every other territory.

Weiss Depo. at 113-14.

7

Perks denies telling Weiss that a national contract with LabCorp was in place during her interview.  Perks Depo. at 60-62.  According to Perks, any conversation regarding a LabCorp contract would have been limited to the existence of a pilot program and the hope that, should the pilot program prove successful, a national contract would be obtained.  Perks Depo. at 60-62.

On December 1, 2009, Weiss interviewed with Brian Best, the then-Vice-President of Commercial Operations.  Weiss Depo. at 28-29.  The next day, Weiss accepted a RAM position with Tethys covering West Virginia.  Weiss Depo. at 30-31.

Best testified that he never informed Weiss Tethys had national contracts with any laboratory.  Best Depo. at 53.  Weiss also does not recall discussing LabCorp contracts with Best during her interview.  Weiss Depo. at 30.

B.    *Weiss's Performance*

On December 14, 2009, Weiss began her employment with Tethys.  Weiss Depo. at 38-39.  Throughout her employment with Tethys, Weiss never met her sales goals.  Weiss Depo. at 59-60; 66-67; 135.  On July 23, 2010, Weiss was placed on a Performance Improvement Plan ("PIP") due to ongoing sales deficiencies.  Weiss Depo. at 135-37; Exhibit 10.  Under the terms of the PIP, Weiss had to generate a specified number of sales by a certain date or her employment with Tethys would be terminated.  Weiss Depo. Exhibit 10.  On July 26, 2010, Weiss signed the PIP.  Weiss Depo.

8

Exhibit 10.  On August 6, 2010, when Weiss failed to make the
sales target outlined in the PIP, her employment with Tethys was
terminated.  Weiss Depo. at 102; 135-25.

C.      *Use of Gift Cards and Other Methods to Generate Sales*

        Weiss claims that she was told to "[d]o whatever it takes
to get the sale" to generate sales of PreDx.  Weiss Depo. at 42.
In particular, she claims that she was told on multiple occasions
by Tethys management to incentivize offices to obtain sales,
including the use of gift cards and other enticements.  Weiss
Depo. at 44, 46.  Weiss states that she notified Tethys on
multiple occasions of her objection to using gift cards or other
enticements to make sales.  Weiss Depo. at 46-47, 51-55.

        According to Best, the practice of using gift cards to
generate sales was not approved or encouraged by Tethys.  Best
Depo. at 70.  When Seneca Garrett, a Regional Account Manager with
Tethys, admitted to using gift cards to get business, Best
directed Garrett's supervisor to notify Garrett that it was not
appropriate to use gift cards to induce sales.  Best Depo. at 70.

D.      *Procedural History*

        On or about September 23, 2010, Weiss, along with Tim
Brown, Michael Lillie, Richard Hidalgo, and Valerie Honaker
(collectively "Plaintiffs"), filed the instant action against
Tethys in the Circuit Court of Mercer County.  On October 21,
2010, Tethys removed the case to this court on the basis of

diversity jurisdiction.  All of the remaining plaintiffs[2] except for Weiss are residents of states other than West Virginia.  <u>Id.</u> at ¶ 4. On March 30, 2012, the court granted plaintiffs' second motion to amend which sought to add Cynthia Walker, a resident of Indiana, as a plaintiff and assert claims for negligence and negligent misrepresentation.

Plaintiffs' Second Amended Complaint contains four claims relevant to Weiss:  Actual and/or Constructive Fraud (Count I), Negligent Misrepresentation (Count II), Negligent Supervision and/or Training (Count III), and Retaliatory Discharege (Count IV).  The instant motion seeks judgment in Tethys' favor on all the claims asserted by Weiss.

## Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  This burden can be met by showing that

---

[2] A Stipulation of Dismissal, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), as to plaintiff Tim Brown was filed on June 8, 2011.

the nonmoving party has failed to prove an essential element of
the nonmoving party's case for which the nonmoving party will
bear the burden of proof at trial.  Id. at 322.  If the moving
party meets this burden, according to the United States Supreme
Court, "there can be 'no genuine issue as to any material fact,'
since a complete failure of proof concerning an essential element
of the nonmoving party's case necessarily renders all other facts
immaterial."  Id. at 323.

Once the moving party has met this burden, the burden
shifts to the nonmoving party to produce sufficient evidence for
a jury to return a verdict for that party.

> The mere existence of a scintilla of
> evidence in support of the plaintiff's
> position will be insufficient; there
> must be evidence on which the jury could
> reasonably find for the plaintiff.  The
> judge's inquiry, therefore, unavoidably
> asks whether reasonable jurors could
> find, by a preponderance of the
> evidence, that the plaintiff is entitled
> to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 250-51.

## **Analysis**

A.    *Fraud*

According to Weiss, Tethys committed fraud when it
informed her during her interview that it had a national contract
with LabCorp.  Tethys denies ever making such a representation.

11

Under West Virginia law, "[t]he essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.'" <u>Bowens v. Allied Warehousing Servs., Inc.</u>, 729 S.E.2d 845, 852 (W. Va. 2012) (quoting <u>Horton v. Tyree</u>, 104 W. Va. 238, 242, 139 S.E. 737 (1927)).  A party "who alleges fraud must clearly and distinctly prove it, either by circumstantial or direct evidence.  It will not be presumed from doubtful evidence, or circumstances of suspicion.  The presumption is always in favor of innocence and honesty." <u>Bowens</u>, 729 S.E.2d at 851-52.

"Furthermore, `actionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence' and `it cannot be based on statements . . . which constitute expressions of intention, unless the non-existence of the intention to fulfill the promise at the time it was made is shown.'" <u>Ziegenfuss Drilling, Inc. v. Frontier-Kemper Constructors, Inc.</u>, Civil Action No. 2:07-cv-00342, 2009 WL 2599308, *2 (S.D.W. Va. Aug. 20, 2009) (quoting <u>Croston v. Emax Oil Co.</u>, 195 W. Va. 86, 464 S.E.2d 728, 732 (W. Va. 1995)). "Predictions as to future events, made in the honest belief that

they will prove correct, cannot serve as the basis of fraud."
Croston v. Emax Oil Co., 195 W. Va. 86, 464 S.E.2d 728, 732 (W.
Va. 1995).  "Fraud cannot be predicated on a promise not
performed.  To make it available there must be a false assertion
in regard to some existing matter by which a party is induced to
part with his money or property."  Id. (quoting Syl. pt. 1, Love
v. Teter, 24 W. Va. 741 (1884)) (emphasis in original).

       According to Tethys, Weiss has not identified any
misrepresentation regarding the existence of a LabCorp contract.
Tethys argues that Ms. Perk's statements with respect to a
national LabCorp contract were mere statements of hope regarding
future events.  In other words, at best, Perk's remarks were
misrepresentations of future events.

       The court agrees with Tethys that Weiss has not pointed
to a misrepresentation of existing fact regarding the existence
of a national contract with LabCorp that induced her to accept
employment with Tethys.  At no point during her interview was
Weiss told that a national contract with LabCorp was in place.
While Ms. Perks may have been overly optimistic, this does not
rise to actionable fraud.  "A statement or promise, to be
actionable on the grounds of fraudulent misrepresentation, must
be of a fact alleged to exist in the present or past, contrary to
the truth, as an inducement to a contract, and not a general
guaranty or promise as to the future events, dependent on future

13

contingencies, thoroughly believed in by the person making the statement, be he ever so badly mistaken in his opinion or judgment."  Syl. pt. 1, <u>Buena Vista Co. v. Billmyer</u>, 48 W. Va. 382, 37 S.E. 583 (1900).  As the <u>Buena Vista</u> court further noted, "[t]he plea, as a whole, is to the effect that the president assured him what the company expected him to do in the future, and, because he trusted him, he believed the promises would come true.  It is impossible to say that such representations were fraudulent, although defendant was induced thereby to purchase the lots.  He banked on another man's opinion and lost."  <u>Id.</u>, 37 S.E. at 585.

The only misrepresentation of an existing fact that Weiss points to occurred <u>after</u> she had accepted employment with Tethys.

Q: Did you ask Trisha any questions about the status of the pilot program?

A: I did.  And she said it was extremely successful based on what Jeff Ehrlich had done.

Q: Do you discuss any other territories were [sic] there was a RAM involved with the pilot program?

A: I don't recall that.  I just recall her mentioning Jeff by name, and discussing what his bonus had been.

Q: Did Trisha indicate to you that there was a particular date when the arrangement with LabCorp would be finalized?

A: She said in December.

Q: Do you know when?

A: No, I didn't.

14

Q:   Did she indicate to you that there were ongoing
     negotiations with respect to any arrangement between
     Tethys and LabCorp?

A:   Yes.  That did change from "we are expecting" to "we
     have" contracts.

         Later in December, she sent out – – or talked to
     us on the phone in a conference call and said that
     they did have the contract now.  So later in the
     process, we found out that they did have the
     contract in place.

Q:   All right.  Tell me about that, when did you receive
     a telephone call?

A:   That was in – – it was later in December.

Q:   And who made the telephone call?

A:   Trisha Perks told us that they did definitely have
     the contract, a national contract with LabCorp at
     that point.

Q:   Was this a telephone conference call of all the
     RAM's?

A:   I believe it was just myself and Trisha because I
     called to ask the specific question, when will we
     have the contract.

Q:   And again, did she tell you that the contract had
     been signed or that it was in process?  It was being
     negotiated?  What was the status?

A:   She basically, the terminology that she used from
     that point on was, we have a national contract now
     with LabCorp.

Weiss Depo. at 24-26.  This alleged misrepresentation could not

serve as the basis for Weiss' fraud claim, however, because it

was made after she accepted employment with Tethys and thereby

the element of reliance is missing.

15

Based on the foregoing, Tethys' motion for summary judgment as to Count One is GRANTED.

B.      *Negligent Misrepresentation*

"West Virginia also recognizes a cause of action for negligent misrepresentation." Ochala v. Dyncorp International LLC, Civil Action No. 3:08-1027, 2009 WL 4152966, *5 (S.D.W. Va. Nov. 23, 2009) (Chambers, J.). "[O]ne under a duty to give information to another, who makes an erroneous statement when he has no knowledge on the subject and thereby misleads the other to his injury, is as much liable in law as if he had intentionally stated a falsehood." Id. (quoting Folio v. City of Clarksburg, 221 W. Va. 397, 405, 655 S.E.2d 143 (W. Va. 2007)).

As with Count One, there is no evidence that Tethys made a misrepresentation that induced Weiss to take the job. Accordingly, the motion for summary judgment as to Count II is GRANTED.

C.      *Negligent Training/Negligent Supervision*

In support of her negligence claim, Weiss contends that Tethys breached a duty of care owed to her by "(a) fail[ing] to adequately train its interviewers, and/or (b) fail[ing] to adequately inform its interviewers regarding the existence of contracts with medical laboratories and agreements with HMO's, and/or (c) fail[ing] to use reasonable care and to exercise due diligence in determining the existence of contracts with medical

laboratories and agreements with HMO's prior to making affirmative statements on the subject." Second Amended Complaint ¶ 42. Stated another way, Weiss contends that Tethys was negligent in its training and/or supervision of its interviewers.[3]

"West Virginia does not recognize a standalone claim for negligent training or supervision." Heslep v. Americans for African Adoption, Inc., Civil Action No. 1:11CV56, 2012 WL 3686769, *12 (N.D.W. Va. Aug. 27, 2012); Ball v. Baker, Civil Action No. 5:10-cv-00955, 2012 WL 4119127, *11 (S.D.W. Va. Sept. 18, 2012) ("The Court has not found, and the parties have not cited to, any state authority for a stand-alone claim for negligent training or supervision."); Webb v. Raleigh County Sheriff's Dept., 761 F. Supp.2d 378, 397 (S.D.W. Va. 2010) (same). Accordingly, negligent training and supervision claims have been treated like other claims based in tort. Ball, 2012 WL 4119127, *11. Furthermore, "a claim for negligent supervision requires a separate finding of negligence on the part of the employee being supervised." Heslep, 2012 WL 3686769, *12; see also Taylor v. Cabell Huntington Hosp., Inc., 538 S.E.2d 719, 725

_____

[3] Weiss's contention that Tethys failed to use reasonable care and due diligence in determining the existence of contracts with medical laboratories prior to making affirmative statements on the subject is actually just a restatement of her negligent misrepresentation claim and does not support a separate claim for negligence.

(W. Va. 2000) ("The appellant's claim of negligent supervision must rest upon a showing that the hospital failed to properly supervise Nurse Grim and, as a result, Nurse Grim committed a negligent act which proximately caused the appellant's injury.")[4]

Tethys contends that it is entitled to judgment in its favor on this claim because Weiss cannot prove the elements of either a negligent supervision or negligent training claim. Rather than address the deficiencies noted by Tethys in any meaningful way, plaintiff merely states that this claim is not ripe for decision because she has not engaged in discovery on the issue. According to her, plaintiffs' motion to amend seeking to add this claim was awaiting disposition when discovery in this case closed and, therefore, the motion for summary judgment is premature. Plaintiff did not file an affidavit or declaration pursuant to Fed. R. Civ. P. 56(d). Nor did she seek to reopen discovery once the court granted the motion to amend.

The court agrees with Tethys that is somewhat disingenuous for plaintiff to complain, at this juncture, that she did not have the opportunity to conduct discovery on the

---

[4] Taylor raises concerns about the "viability of a negligent supervision claim in cases governed by the doctrine of respondeat superior." Taylor v. Cabell Huntington Hosp., Inc., 538 S.E.2d 719, 725 (W. Va. 2000) (noting that plaintiff's "purpose in bringing a negligent supervision claim [wa]s not clear to this Court" where, if negligent act of employee caused plaintiff's injury, hospital would be liable under a theory of respondeat superior).

negligent training/supervision claim.  The depositions in this matter confirm that Tethys engaged in discovery regarding these claims even though the motions to amend remained pending. Furthermore, plaintiff has not suggested that she was somehow thwarted in her effort to conduct discovery on this claim by Tethys.

On October 1, 2012, the court reopened discovery in this matter for a period of 45 days to allow additional discovery regarding Count III.  At the conclusion of this 45 days, Tethys was to be permitted to file another summary judgment motion as to this claim.  For this reason, the court will DENY Tethys' motion as to this count without prejudice.  Tethys is, however, permitted to renew its motion given that the time period for this additional discovery has passed and plaintiffs did not seek an extension of the 45-day period.

D.      *Retaliatory Discharge*

Weiss contends that Tethys encouraged her to use gift cards and other "unethical and illegal means" to promote sales of the PreDx test.  According to her, she was discharged because of her refusal to use these "unethical and illegal means."  Second Amended Complaint ¶¶ 45-48.

In West Virginia, it is well established that "[w]hen a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract."  <u>Swears</u>

19

v. R.M. Roach & Sons, Inc., 225 W. Va. 699, 696 S.E. 2d 1, 5 (W.
Va. 2010) (quoting Syl. pt. 2, Wright v. Standard Ultramarine &
Color Co., 141 W.Va. 368, 90 S.E. 2d 459 (1955)).  "Thus, an
at-will employee serves at the will and pleasure of his or her
employer and can be discharged at any time, with or without
cause."  Id. at 5-6 (internal citations and quotations omitted).
"Therefore, absent some substantial public policy exception to
the at-will employment doctrine, an employee may be terminated at
any time, with or without cause."  Id. at 6.

    The elements of the tort of wrongful discharge under West
Virginia law are:

> (1)  [Whether a] clear public policy existed and was
>      manifested in a state or federal constitution,
>      statute or administrative regulation, or in the
>      common law (the clarity element);
>
> (2)  [Whether d]ismissing employees under circumstances
>      like those involved in the plaintiff's dismissal
>      would jeopardize the public policy (the jeopardy
>      elements);
>
> (3)  [Whether t]he plaintiff's dismissal was motivated by
>      conduct related to the public policy (the causation
>      element); and
>
> (4)  [Whether t]he employer lacked overriding legitimate
>      business justification for the dismissal (the
>      overriding justification element).

Williams v. Basic Contracting Services, Inc., Civil Action No.
5:09-cv-00049, 2010 WL 3244888, *8 (S.D.W. Va. Aug. 17, 2010)
(Johnston, J.) (quoting Feliciano v. 7-Eleven, Inc., 210 W. Va.
740, 559 S.E.2d 713, 723 (W. Va. 2001)).

"To identify the sources of public policy for purposes of determining whether a retaliatory discharge [under West Virginia law] has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Armstrong v. West Virginia Division of Culture and History, 229 W. Va. 538, 729 S.E. 2d 860, 867 (W. Va. 2012) (quoting Syl. pt. 2, Birthisel v. Tri-Cities Health Servs. Corp., 188 W. Va. 371, 424 S.E. 2d 606 (1992)). Furthermore, "in order to sustain a cause of action for wrongful discharge, the public policy relied upon must not just exist; it must be substantial." Feliciano, 559 S.E.2d at 718. "[T]o be substantial, a public policy must not just be recognizable as such but must be so widely regarded as to be evident to employers and employees alike." Id.

Weiss contends that Tethys' direction regarding the use of gift cards violated two federal statutes and, as such, contravened the public policy of West Virginia.  Tethys disagrees that its actions violated any statute - - federal or otherwise - - but argues that, in any event, federal public policy cannot be used to support a claim for retaliatory discharge under West Virginia law.

The court disagrees with Tethys' assertion that federal law cannot serve as a source of public policy for purposes of West Virginia's at-will employment exception.  See Williams v.

Basic Contracting Services, Inc., Civil Action No. 5:09-cv-00049, 2010 WL 3244888, *9 (S.D.W. Va. Aug. 17, 2010) (Johnston, J.) ("West Virginia law specifically allows for federal statutes as a source of public policy. . . ."). Tethys contends that Williams was wrongly decided but this court finds its reasoning persuasive.

However, this court need not decide whether the alleged violation of federal law, without more, violates the public policy of West Virginia[5] because there is insufficient evidence to show that Tethys required Weiss to violate the law or be terminated for a failure to do so. Weiss contends that Tethys' direction regarding the use of gift cards violated two federal statutes. First, she argues that Tethys' practices in this regard violated 42 U.S.C. § 1395nn(a)(1), the Stark Act. "The Stark Act, also referred to as the Physician Self-Referral Law, prohibits two things if a physician or member of his or her immediate family has a direct or indirect `financial arrangement with an entity:' (1) the physician `may not make a referral to the entity of certain designated health services' covered by the Medicare program; and (2) the entity `may not present or cause to be presented' a claim to Medicare for any such services following

---

[5] Nor need the court decide whether the public policy advanced by Weiss is "substantial" within the meaning of West Virginia law, especially given Weiss' failure to address the "substantiality" issue in her brief.

any such referral.  U.S. v. Center for Diagnostic Imaging, Inc.,
787 F. Supp.2d 1213, 1224 (W.D. Wash. 2011) (quoting 42 U.S.C. §
1395nn(a)(1)(A) and (B)); see also Braun v. Promise Regional
Medical Center-Hutchinson, Inc., No. 11-2180-RDR, 2011 WL
6304119, *3 (D. Kan. Dec. 16, 2011) (same).

     By its plain terms, the Stark Act applies to physician
referrals.  Feldstein v. Nash Community Health Services, Inc., 51
F. Supp.2d 673, 686 (E.D.N.C. 1999) ("The Stark Act, a civil
statute enacted at 42 U.S.C. § 1395nn, prohibits certain
physician referrals where the physician has a financial
relationship with the entity to which he is referring patients.")
(emphasis added).  Weiss does not even attempt to provide a
rationale as to how the section of the Stark Act cited by her, 42
U.S.C. § 1395nn(a)(1), should apply in this case given that
neither she nor Tethys is a physician.[6]

     Furthermore, the Stark Act does not regulate all
physician referrals but only those in which payment will be
sought from Medicare or other federal health care programs.  See
U.S. v. Carlisle HMA, Inc., No. 1:05-CV-2184, 2007 WL 3490537, *6

_____

     [6] Perhaps plaintiff is relying on 42 U.S.C. §
1395nn(a)(1)(B), which she neither cites nor quotes, as the
source of her public policy.  That section, assuming an improper
physician referral has been made, prohibits an entity from making
a claim to Medicare for any such services following any such
referral.  See 42 U.S.C. § 1395nn(a)(1)(B).  However, as will be
discussed infra, there is no evidence that Tethys encouraged
Weiss to violate the Stark Act because Tethys discouraged Weiss
from trying to obtain Medicare and/or Medicaid referrals.

(M.D. Penn. Nov. 14, 2007) ("[T]he Stark Act prohibits a physician from referring patients to a health care entity with which the physician has a "financial relationship" for services covered by <u>Medicare or other federal health care programs</u>.") (emphasis added); <u>McDonnell v. Cardiothoracic & Vascular Surgical Assocs.</u>, No C2-03-0079, 2004 WL 3733404, *9 (S.D. Ohio Aug. 3, 2004) ("Congress enacted Stark to address the strain placed on the Medicare Trust fund by overutilization of certain medical services by physicians who, for their own financial gain rather than their patients' medical needs, referred patients to entities in which the physicians held a financial interest."). There is no evidence in this case that Tethys encouraged Weiss to violate the Stark Act because, by her own admission, Tethys discouraged her from pursuing Medicare and Medicaid sales.[7]

> Q:   It's true that Tethys was not to preclude those
>      tests, but just for people, for the sales
>      representatives to be aware that there was a
>      profitability issue connected with those tests;
>      correct?
>
> A:   Not exactly.
>
> Q:   Okay.  You tell me your version.
>
> A:   They - - and I do believe there is documentation in
>      your information to the fact that on our secondary

---

[7] According to the Second Amended Complaint, Tethys "instructed Plaintiffs to urge medical providers <u>not</u> to order PreDX Diabetes Risk Tests for Medicare and Medicaid patients because Medicare and Medicaid did not pay Defendant the amount Defendant wanted for the PreDX Diabetes Risk Tests."  Second Amended Complaint ¶ 26 (emphasis added).

bonus, or second quarter guidelines for sales,
Trisha had put on there that we were to - - not to
target high volume Medicare, Medicaid offices, which
is primarily what West Virginia has.

So basically what she said is, first of all, it
was to call just on LabCorp.  And then it was to
call - - not to call on Medicare/Medicaid offices,
offices for high value for that area.  So they were
very specific about differentiating between
Medicare/Medicaid, and that we would not be bonused
on any Medicare/Medicaid test that came through.

Weiss Depo. at 95-96.  If there has been no violation of the

Stark Act, "it is manifest that there can be no violation of any

public policy expressed by this statute."  Johnson v. Pepperidge

Farm, Inc., No. 93-1386, 1994 WL 118100, *4 (4th Cir. Apr. 4,

1994).

Based on the foregoing, the Stark Act cannot provide a

basis for Weiss's retaliatory discharge claim in violation of

West Virginia's public policy.

Weiss also alleges that she was terminated for her

refusal to violate the Medicare Anti-Kickback Act.  Like the

Stark Act, the Anti-Kickback Act was enacted to "deter abuse of

federal health care programs . . . ."  See U.S. v. Carlisle HMA,

Inc., No. 1:05-CV-2184, 2007 WL 3490537, *5 (M.D. Penn. Nov. 14,

2007).  A defendant violates the Anti-Kickback Act when he

"knowingly and willfully offers or pays any remuneration . . . to

any person to induce such person . . . to refer an individual to

a person for the furnishing or arranging for the furnishing of

any item or service for which payment may be made in whole or in

part under a Federal health care program. . . ."  42 U.S.C. §

1320a-7b.  "The Anti-Kickback Act reinforces the policies

underlying the Stark Act through criminal sanctions." <u>Carlisle</u>

<u>HMA</u>, 2007 WL 3490537 at *6.

Again, the evidence before the court is that Tethys did

not encourage Weiss to violate the Medicare Anti-Kickback Act

because it specifically deterred her from trying to obtain

Medicare and Medicaid business.  Therefore, she cannot argue that

she was discharged for her refusal to do so.  For this and other

reasons,[8] defendant's motion for summary judgment as to Count IV

is GRANTED.

---

[8] For example, even if Tethys did in fact encourage the use
of gift cards when it was illegal to do so, Weiss's retaliatory
discharge claim would still fail because she has not shown a
causal connection between her refusal to do so and her
termination.  Weiss offers no <u>evidence</u>, other than her own self-
serving explanation, to show that her discharge was in
retaliation for her refusal to solicit business by using gift
cards.  All of the <u>evidence</u> in the record supports Tethys'
position that Weiss was discharged for her job performance, i.e.,
failure to meet sales goals. <u>See Page v. Columbia Natural</u>
<u>Resources, Inc.</u>, 198 W. Va. 378, 480 S.E. 2d 817, 829 (W. Va.
1996) (noting that a plaintiff in an action for wrongful
discharge based upon the contravention of a substantial public
policy must not only establish the existence of policy but must
also establish by a preponderance of the evidence that employee
discharge was motivated by an unlawful factor contravening that
policy).  Furthermore, in order to successfully present a claim
for relief for wrongful discharge in contravention of substantial
public policy, a plaintiff must show that an employer "lacked
[an] overriding legitimate business justification for the
dismissal." <u>Feliciano v. 7-Eleven, Inc.</u>, 210 W. Va. 740, 559
S.E.2d 713, 723 (W. Va. 2001).

## Conclusion

Based on the foregoing, defendant's motion for summary judgment as to Bonnie Weiss was GRANTED as to Counts I, II, and IV.  It was DENIED as to Count III.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

It is SO ORDERED this 4th day of January, 2013.

ENTER:

David A.  Faber
Senior United States District Judge

27